UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA, ET AL, )
ex rel. ADAM WITKIN,             )
                                 )
        Plaintiffs,              )      CIVIL ACTION NO.
                                 )      11-10790-DPW
    v.                           )
                                 )
MEDTRONIC, INC., and             )
MEDTRONIC MINIMED, INC.,         )
                                 )
        Defendants.              )
```

MEMORANDUM AND ORDER
May 23, 2016

Relator Adam Witkin brings this *qui tam* action against Medtronic, Inc. - and its wholly-owned subsidiary Medtronic MiniMed, Inc. (collectively, "Medtronic") - as a relator on behalf of the United States, 26 individual states and the District of Columbia.  He alleges violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, as well as violations of the FCAs of those states and the District of Columbia.  Witkin also seeks relief under federal and state law for allegedly retaliatory discharge.  Medtronic moves to dismiss the complaint for failure to state a claim.

## I. BACKGROUND

### A. *Overview of the Allegations*

Medtronic sells a variety of products for the treatment and management of diabetes.  Sec. Am. Compl. ¶ 73.  An estimated 26

million Americans have diabetes, a condition in which the body is not able to regulate levels of glucose in the blood.  *Id.* ¶ 61.  Less than 10% of diabetes patients suffer from Type 1 diabetes, an autoimmune disease in which the body does not produce enough insulin to move glucose from the blood to the cells.  *Id.* ¶¶ 62-63.  More than 90% of diabetes patients have Type 2 diabetes, a condition in which the body has developed a resistance making insulin inefficient at moving glucose from the blood to the cells.  *Id.* ¶¶ 63-64.

Among the products Medtronic sells are insulin pumps allowing the continuous delivery of insulin, Sec. Am. Compl. ¶¶ 68-70, 74.  These pumps serve as an alternative to multiple daily injections of insulin.  *Id.* ¶ 67-68.  Medtronic also sells "continuous glucose monitoring" devices.  *Id.* ¶¶ 71, 74.  The monitoring device is inserted under the patient's skin with a needle.  *Id.* ¶ 71.  Medtronic sells one for professional use called the "iPro," *id.* ¶ 123.  A patient is fitted with an iPro device in a physician's office and sent home to collect glucose data over several days, after which the data can be interpreted for treatment recommendations.  *Id* ¶ 124.  Medtronic also sells an integrated diabetes management system in which an insulin pump is paired with a glucose monitoring device.  *Id.* ¶ 78.

Witkin was employed with Medtronic's diabetes division from November 2004 until his termination on February 28, 2011.  Sec.

2

Am. Compl. ¶ 45.  He sold Medtronic medical devices for the treatment and management of diabetes in his capacity as a Territory Manager and Senior Territory Manager in Oregon.  *Id.* Witkin alleges that, in the course of his employment, he learned about fraudulent behavior by Medtronic that resulted in false claims to government health care programs, including Medicare, Medicaid, CHAMPUS/TRICARE, and CHAMPVA.  *Id.* ¶¶ 92-96.

Many of Witkin's allegations involve Medtronic's efforts to expand insulin pump use among Type 2 diabetes patients.  Insulin pumps historically were used by Type 1 diabetes patients, *id.* ¶ 69, and a small set of Type 2 diabetes patients with extreme forms of insulin resistance, *id.* ¶ 7.  Expanding pump use among Type 2 patients more generally was, Witkin alleges, central to Medtronic's national sales strategy.  *Id.* ¶¶ 121.  Pump therapy also allowed patients to receive more complete insurance coverage for their diabetes care, due to differences in reimbursement for insulin when purchased independently and when used in conjunction with a pump.  *See id.* ¶ 149.

More specifically, Witkin alleges that Medtronic paid kickbacks and other illegal remuneration to physicians to induce them to prescribe Medtronic insulin pumps to their patients. Sec. Am. Compl. ¶¶ 121-309.  He also alleges that Medtronic helped Type 2 patients falsify their qualifications for insulin pump therapy, resulting in claims to government payors for

reimbursement of ineligible and unnecessary pumps. *Id.* ¶¶ 493-551.

According to Witkin, Medtronic also fraudulently promoted its insulin pumps for uses not approved by the U.S. Food and Drug Administration ("off-label" uses). For example, Medtronic allegedly misrepresented the safety and efficacy of using high-concentration "U-500" insulin with its pump, when the pump was approved only for use with lower-concentration "U-100" insulin. Sec. Am. Compl. ¶¶ 310-423. The resulting claims for reimbursement as to the pump and the insulin were thereby false.

Witkin further alleges that Medtronic used false representations to promote off-label use of its adult diabetes management systems by pediatric patients, *id.* ¶¶ 424-91. An earlier complaint also alleged that Medtronic used fraudulent practices to induce unnecessary orders for insulin pump upgrades and replacements, First Am. Compl. ¶¶ 428-76, although these claims were voluntarily dismissed on May 30, 2013 and have not been reasserted in the Second Amended Complaint.

Count I seeks to hold Medtronic liable under the FCA, based on fraudulent conduct which caused or was material to false claims made to federal health care programs, and based on its avoidance of obligations to repay the government by failing to report overpayments received as a result of false claims. Count II seeks to hold Medtronic liable under false claims statutes of

the 26 named states and the District of Columbia (collectively, the "state FCAs").  Count III seeks damages under California and Illinois insurance fraud statutes.  Cal. Ins. Code § 1871.7; 740 Ill. Comp. Stat. § 92.

In Count IV, Witkin alleges that his termination in February 2011 constituted illegal retaliation for his efforts to investigate and stop Medtronic's FCA violations, in violation of the federal FCA, 31 U.S.C. § 3730(h).  *See* Sec. Am. Compl. ¶¶ 562-94.  Witkin also seeks relief for his allegedly wrongful termination under Oregon's whistleblower protection law, Or. Rev. Stat. Ann. § 659A.199 (Count V), and the common law of Oregon and California (Count VI).

**B.   *Procedural History***

Witkin filed this action on May 5, 2011.  The complaint was kept under seal until the United States declined to intervene in the action.  *Cf.* 31 U.S.C. § 3730(b)(2).  The states, too, have declined to intervene.

Medtronic moved to dismiss Witkin's initial complaint on January 7, 2013.  Witkin responded by filing an Amended Complaint on February 11, 2013.  Medtronic thereafter filed a motion to dismiss for failure to state a claim.  Witkin opposed the motion.  In doing so, he also conditionally sought leave to amend the complaint by representing that he could "provide additional factual detail" if necessary.  I granted leave to

amend and the operative Second Amended Complaint was filed on August 1, 2013.  Medtronic has again moved to dismiss for failure to state a claim.

At this point, I note that I am unlikely to grant any additional requests to amend the complaint in this matter.  Of course, "Amendments may be permitted . . . even after a dismissal for failure to state a claim, and leave to amend is 'freely given when justice so requires.'" *Palmer* v. *Champion Mortgage*, 465 F.3d 24, 30-31 (1st Cir. 2006) (quoting Fed. R. Civ. P. 15(a)).  But it is also true that in "appropriate circumstances," including "undue delay, bad faith, futility, and the absence of due diligence on the movant's part," leave to amend may be denied.  *Id.*  The "balance of pertinent considerations" in deciding whether to allow an amendment requires an inquiry into the totality of the circumstances.  *Id.* One important consideration is judicial economy.  "[T]rial courts, in the responsible exercise of their case management functions, may refuse to allow plaintiffs an endless number of trips to the well," particularly where they have already "afforded the plaintiffs an ample opportunity to put their best foot forward." *Aponte-Torres* v. *Univ. Of Puerto Rico*, 445 F.3d 50, 58 (1st Cir. 2006).  This action is now on its second amended complaint – one significantly expanded from relator's original submission – and I have already informed relator that

this second amended complaint was to be his best, and final, effort at stating his claims.  Accordingly, I expect that there is nothing left for relator to add that would not futilely result in another dismissal, at the expense of defendants and the legal system generally.  He will not be permitted, absent circumstances unforeseen at this juncture, to try to reformulate his allegations, yet again, to avoid their legal deficiencies.

## II. LEGAL FRAMEWORK

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Berner* v. *Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley* v. *Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (internal quotation marks omitted)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"  *Maldonado v.*

*Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

FCA allegations and their state counterparts are also subject to the heightened pleading standards of Fed. R. Civ. P. 9(b).  *U.S.* ex rel. *Duxbury* v. *Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To satisfy Rule 9(b), "a complaint must specify the time, place, and content of an alleged false representation."  *U.S.* ex rel. *Rost* v. *Pfizer, Inc.*, 507 F.3d at 720, 731 (1st Cir. 2007) (citations and internal quotation marks omitted).[1]  Conclusory allegations are insufficient, but Rule 9(b) may be satisfied "when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster."  *U.S.* ex rel. *Gagne*

---

[1] There is some debate whether the Supreme Court decision in *Allison Engine Co.* v. *United States* ex rel. *Sanders*, 553 U.S. 662 (2008), abrogated the First Circuit's decision in *U.S.* ex rel. *Rost v. Pfizer, Inc.*, 507 F.3d 720, 731 (1st Cir. 2007) and *United States* ex rel. *Karvelas* v. *Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004) in this regard.  However, the First Circuit itself has stated that "*Allison Engine* concerns a different issue and does not alter those fraud with particularity requirements" articulated in *Rost* and *Karvelas*. *U.S.* ex rel. *Gagne* v. *City of Worcester*, 565 F.3d 40, 42 (1st Cir. 2009).  A*llison Engine* merely "forecloses . . . a broad reading" of certain portions of these opinions.  *Id*. at 46 & n.7.

v. *City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009) (citation omitted).

The First Circuit has recognized a "distinction between a *qui tam* action alleging that the defendant made false claims to the government, and a *qui tam* action in which the defendant induced *third parties* to file false claims with the government." *Duxbury*, 579 F.3d at 29.  In the latter case, a relator may satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim." *Id.* (internal quotation omitted).

### III. FALSE CLAIMS ACT

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).  The FCA also prohibits what have come to be called "reverse" false claims, and imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G).[2]

I discuss in turn the various ways in which Witkin alleges Medtronic is subject to false claims liability to determine if any satisfy the pleading requirements of Rule 9(b).

## A.   *Illegal Remuneration*

The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, broadly prohibits the offer or payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in return for referrals to any individual for the purpose of furnishing items or services reimbursable by federal health care programs, *id.* § 1320a-7b(b)(1)(A), or in return for recommendations for purchasing items reimbursable by federal health care programs, *id.* § 1320a-7b(b)(1)(B).  The Stark Act, 42 U.S.C. § 1395nn, prohibits physicians having "compensation

---

[2] As a formal matter, for purposes of this motion, I apply the provisions of § 3729 as amended by the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat. 1617, 1621 (2009).  The FERA amendments generally apply to conduct on or after May 20, 2009.  FERA, § 4(f), 123 Stat. at 1625.  With respect to § 3729(a)(1)(B), the amendments apply to claims pending as of June 7, 2008.  *Id.*  Witkin alleges conduct and claims occurring both before and after these effective dates. The parties, however, agree that the amendments do not affect my resolution of this motion.  I also construe the state FCAs invoked by Witkin consistently with the provisions of the federal FCA.  *Cf. New York* v. *Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011).

arrangement[s]" with any entity, involving "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind," from making a referral to that entity for furnishing health services, *id.* § 1395nn(a), (h)(1)(B); 42 C.F.R. § 411.351 ("remuneration" includes "any payment or other benefit").

Liability under the AKS also requires intent to induce a referral or recommendation. 42 U.S.C. § 1320a-7b(b)(2). The Stark Act contains no such intent requirement but prohibits referrals based solely on the existence of a specified compensation arrangement. 42 U.S.C. § 1395nn(a). Safe harbors are available under both statutes for compensation for part-time services, provided a variety of requirements are met, including, as relevant here, that payment be established in advance at a fair market value rate. *See* 42 U.S.C. § 1395nn(e)(3); 42 C.F.R. § 1001.952(d).[3]

---

[3] Witkin says the safe harbors are irrelevant to his pleading obligations because establishing eligibility for those safe harbors is Medtronic's burden. *United States* v. *Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008). While I agree that pleading the inapplicability of the safe harbors is not a prerequisite to stating a claim under the AKS or the Stark Act, Witkin is undertaking to state a claim under the FCA. Viewed through the prism of an FCA claim, the analysis is slightly different. Pleading conduct that states a *prima facie* Stark Act violation is not the same as pleading conduct that amounts to false claims to the government. I conclude that Witkin needs to have alleged conduct that plausibly would have *violated* the AKS or the Stark Act, including negation of safe harbors, in order to make a supported allegation that the claims induced by the alleged conduct were false under the FCA.

Central to Witkin's kickback allegations are so-called "iPro clinics." An "iPro clinic" refers to a session in a doctor's office in which diabetes patients were invited to be fitted with the iPro device to evaluate their current diabetes management. Sec. Am. Compl. ¶ 126. Medtronic used the clinics to gain "one-on-one access" to patients who had been treating their diabetes through multiple daily injections, in hopes of converting them to use Medtronic insulin pumps and, allegedly, to compensate providers in order to generate additional pump orders. *Id.* ¶¶ 127, 142, 148-54.

Witkin alleges illegal remuneration in essentially two forms. First, Witkin alleges that Medtronic paid or offered remuneration by running iPro clinics in doctors' offices, often without physician involvement, *e.g.*, Sec. Am. Compl. ¶¶ 127-61 (describing clinics), ¶¶ 210-212 (Medtronic paying nurses to staff clinics), while promoting the ways in which the physician could bill Medicare for patient iPro clinic visits, *see id.* ¶¶ 131-41.

Second, Witkin alleges that Medtronic paid providers at above-market rates to train patients in the use of Medtronic's insulin pumps, *id.* ¶¶ 178-98, and also provided a variety of other collateral benefits such as free sample devices, meals, and travel and accommodations for conferences at luxury venues. *Id.* ¶¶ 213-20.

12

Such remuneration, Witkin argues, led providers to refer patients to Medtronic for the purchase of insulin pumps and to recommend the purchase of Medtronic insulin pumps, payment for which would be made by federal health care programs.  The resulting claims, tainted by the antecedent kickbacks, were thereby false.  *Cf.* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of [the federal anti-kickback statute] constitutes a false or fraudulent claim [for purposes of the FCA]."); *New York* v. *Amgen Inc.*, 652 F.3d 103, 110-11 (1st Cir. 2011) (claims induced by kickbacks false when they "misrepresent[] compliance with a material precondition of payment forbidding the alleged kickbacks").

I first address whether Witkin has stated a claim under this theory before turning to whether he has pled fraud in this respect with adequate particularity to satisfy Rule 9(b).

1.   Remuneration

    a.   *iPro Clinics*

I agree with Medtronic that merely explaining to physicians the manner in which iPro services could be billed to Medicare does not in itself constitute an offer of remuneration by Medtronic.  *Cf. United States* v. *Shaw*, 106 F. Supp. 2d 103, 120 (D. Mass. 2000) ("profit motive does not necessarily trigger criminal liability").  The Department of Health and Human Services Office of the Inspector General has indicated that a

manufacturer's "reimbursement support services in connection with its own products" have "no independent value."  OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23735 (2003).  Medtronic's alleged activity here is a step removed from reimbursement support for a product user; Witkin alleges primarily *promotional* activity regarding reimbursement rather than active support for a product user. Medtronic's explanation of the benefits to physicians of using the iPro device does not in and of itself confer a benefit on those physicians.

That said, the character of these promotional activities changes when combined with Witkin's allegation that Medtronic staff often ran iPro clinics at no cost to the host physicians and entirely independently of a physician or his or her staff. *See, e.g.*, Sec. Am. Compl. ¶¶ 154-62.  The allegation that Medtronic effectively instructed physicians on billing Medicare for procedures that Medtronic provided for free transforms what would be an otherwise innocuous patient-promotion practice into an offer of remuneration to the physicians.  Medtronic responds by outlining the circumstances in which physicians are permitted to bill for services provided by ancillary professionals like nurses or diabetes educators.  That would be a legitimate defense against the independent falseness of claims by physicians for reimbursement of iPro services.  Witkin, however,

does not pursue this theory of false claims and, even if he did, there are no particularized allegations to support this theory. *See* Part III.A.3, *infra*.

Rather, the theory of false claims pursued here involves claims for reimbursement of insulin pumps, the falsity of which derived from referrals or recommendations by doctors who had in turn been influenced by kickbacks from Medtronic.  And, more importantly for present purposes, even a physician *legitimately* billing Medicare for properly-supervised iPro clinic services has received remuneration when he otherwise would have had to expend additional money or time to administer the services himself or pay staff to do so.  Witkin has therefore adequately alleged remuneration through the iPro clinics.

  b.   *Pump Training*

Witkin also alleges that Medtronic paid providers to train patients in the use of its insulin pumps.  Medtronic relies on the statutory safe harbors to argue that these payments do not amount to illegal remuneration.  *See* 42 U.S.C. § 1395nn(e)(3); 42 C.F.R. § 1001.952(d).  The Amended Complaint itself indicates that many of the requirements of the safe harbors would be met; for example, the requirement of written agreements for periodic work.  *See* Sec. Am. Compl. ¶ 184.

The safe harbors, however, would also require Medtronic to show that providers were paid at market value for their

services.  Witkin has plausibly alleged that the payments were not at market value by comparing the training rates paid by Medtronic with patient training rates paid by Medicare for comparable services.  As alleged in the Amended Complaint, Medicare consistently reimbursed at a significantly lower rate than Medtronic.  Specifically, Medtronic paid a total of $425 for the initial training of new pump wearers and $325 for replacement or upgrade training, while Medicare paid a maximum of $176.80 for initial training and $51.96 for a replacement training (the Medicare rates rose to $296.30 and $74.76 in 2011).  Sec. Am. Compl. ¶¶ 186-89.  Of course, Medicare is one payor among many, and the allegation of Medicare's reimbursement rates does not in and of itself establish the market rate.  But the reimbursement rates paid by Medicare and Medtronic are sufficiently divergent to indicate plausibly that one of them is off-market.  Moreover, the reimbursement rates of other private entities are unlikely to be available to Witkin, making this the type of allegation on which he is entitled to some degree of leeway.  *Cf. U.S.* ex rel. *Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 229 (1st Cir. 2004).

Medtronic repeatedly raises the argument that patients must receive training and education in order to be eligible for Medicare reimbursement, *see* Sec. Am. Compl. ¶¶ 496-99, and that Medtronic is under an ethical obligation to make such training

and education available.  Even so, this does not allow Medtronic
to use above-market payments to provide such training as a
kickback for prescribing or recommending the use of Medtronic
products.  Witkin has therefore also adequately alleged
remuneration as to pump training.

       *c.*   *Remaining Allegations*

There is little question that the other alleged benefits
that Medtronic gave to providers — including free supplies,
meals, and trips — constitute remuneration.[4]  Accordingly, all of
Witkin's remuneration claims are adequately alleged as to the
remuneration itself.

    2.   <u>Intent to Induce (AKS Only)</u>

Medtronic argues that Witkin has failed to allege any
intent to induce providers to prescribe insulin pumps.  An
intent to induce referrals in this context means an intent "to
gain influence over the reason or judgment" of the physicians in
whose offices Medtronic ran iPro clinics.  *United States* v.
*McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000).

---

[4] One paragraph of the Amended Complaint appears to allege that
Medtronic also paid or offered remuneration directly to iPro
clinic patients in the form of free supplies or waiver of co-
pays.  Sec. Am. Compl. ¶ 151.  Witkin has not, however, relied
on this allegation in his opposition to the motion to dismiss,
and the Second Amended Complaint includes no particularized
pleading to support this allegation.

As to the allegations regarding training payments and other freebies, the off-market value of the remuneration is sufficient at this stage to support an inference of intent to induce referral or recommendation of Medtronic insulin pumps. *Cf.* *United States* v. *Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006) (significant overpayment permits inference that payment intended as kickback), *aff'd* 517 F.3d 449 (7th Cir. 2008).

Witkin's allegations related to iPro clinics, however, are more attenuated.  Although pump training payments are directly tied to the antecedent prescription of Medtronic pumps, it is more difficult to draw the inference that remuneration tied to iPro clinics was designed to induce physicians to make referrals or recommendations for pumps.  In fact, the Second Amended Complaint explains at length that Medtronic saw the primary value of iPro clinics as providing sales representatives with "one-on-one" access to patients.  *See* Sec. Am. Compl. ¶¶ 149-57. According to the Second Amended Complaint, Medtronic sales representatives knew they needed to "insert themselves" into iPro clinics in order to create sales opportunities because, otherwise, "the physicians [would] simply use the information gained from the continuous glucose monitoring device to adjust the patient's current MDI regimen."  *Id*. ¶ 152.[5]

---

[5] Based on this allegation, the alleged iPro Clinic remuneration scheme would have been a rather ineffective kickback for

Even so, I believe an intent to induce physician referrals
has been adequately alleged.  The Second Amended Complaint
describes dual motives - Medtronic allegedly administered iPro
clinics both to circumvent physicians and to curry favor with
them.  Thus, even as Medtronic sought one-on-one access to
patients, without physicians present, they also worked to turn
doctors into pump "champions" and "advocates," Sec. Am. Compl. ¶
166, and to get their "economic buy in," *id.* ¶ 169.  By
providing the remuneration of free iPro clinics, Medtronic is
alleged to have pursued two different routes to pump
prescriptions, one beginning with patients and one beginning
with physicians.  At this stage in the litigation, this suffices
to state a claim including intent.

### 3.   Pleading Fraud with Particularity

Witkin's allegations of false claims derived from kickbacks
or other illegal remuneration have also been challenged as
lacking sufficient particularity to satisfy Rule 9(b).  In
particular, Medtronic argues that Witkin fails to plead with
particularity any connection between Medtronic's allegedly
fraudulent acts and false claims.

---

purposes of referrals or recommendations regarding insulin
pumps.  Medtronic knew this.  Although a kickback need not be
effective to be illegal, the alleged ineffectiveness certainly
makes it less plausible that any fraudulent conduct resulted in
false claims.

Relator puts forward clear evidence at the aggregate level that Medtronic promoted to patients on government health care programs, which would likely lead to false claims.  Medtronic collected data showing substantial portions of patients enrolled in Medicare and Medicaid at health clinics working with Medtronic's diabetes team and participating in the remuneration programs at issue, and marketing documents show that this was seen as an opportunity for pump promotion.  Sec. Am. Compl. ¶ 234, 236.  Although relevant, on its own this is insufficient. Pleading fraud in this context requires not only particularized allegations of kickbacks, but also particularized allegations of who received them and when, as well as particularized allegations that those kickbacks caused or were material to claims for reimbursement from the government.  *Cf*. *Duxbury*, 579 F.3d at 30 (relator alleged "the who, what, where, and when" (citation omitted)).  Relator must connect the various allegations into a particularized pleading of fraud.  *Cf*. *U.S. ex rel. Nowak* v. *Medtronic, Inc.*, 806 F. Supp. 2d 310, 356-57 (D. Mass. 2011) ("relators must provide more than merely a detailed outline of a fraudulent scheme"; namely, "a factual basis to support a belief" that a provider submitted a false claim to the government (citation omitted)).

The most detailed allegations showing a specific false claim to have been made concern Dr. Priya Krishnamurthy of

Salem, Oregon.  Relator alleges that he persuaded Dr.
Krishnamurthy to allow Medtronic iPro clinics, after showing her
that Medtronic would do the work and that she could bill
Medicare.  Sec. Am. Compl. ¶ 266.  The iPro clinics were up and
running by October 2010 and occurred at least every Monday,
involving either Witkin or his colleague Christina Makinson.
*Id.* ¶¶ 266-67.  Witkin alleges that Dr. Krishnamurthy billed
specific codes for reimbursement, although Medtronic staff
always performed all the services themselves. *Id.* ¶ 268.  In
addition to alleging that a large portion of her practice, over
one-third, was government-insured, Witkin also alleges that Dr.
Krishnamurthy billed for iPro clinic services provided by
Medtronic to two specific Medicare beneficiaries, identified by
their initials as JW and JR.  *Id.* ¶ 270.  Specific dates are
provided for JW, who allegedly attended an iPro clinic on
October 25, 2010 and was prescribed a pump and insulin on
January 24, 2011.  *Id.* ¶ 271.  While there are some missing
details in this account, which Medtronic extensively catalogues,
there is no "checklist of mandatory requirements" for a False
Claims Act complaint to satisfy the requirements of Rule 9(b);
rather, only "some of this information for at least some of the
claims must be pleaded."  *U.S.* ex rel. *Karvelas* v. *Melrose-
Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004) (citing
*United States* ex rel. *Clausen* v. *Lab. Corp. of Am., Inc.*, 290

F.3d 1301, 1312 n.21 (11th Cir. 2002)).  With respect to Dr.
Krishnamurthy, the "who, what, where and when," has been
adequately pled.

The other examples of false claims alleged contain more
gaps.  For example, a Dr. Rajesh Ravuri of Coos Bay, Oregon, is
alleged to have prescribed insulin pumps to specified Medicare
beneficiary patients, with the dates of shipment specified in
the complaint.  Sec. Am. Compl. ¶¶ 289-90.  The Complaint also
alleges that Relator discussed the financial advantages of iPro
clinics and Medtronic's high reimbursement rates and that Dr.
Ravuri thereafter began conducting iPro clinics and executed a
Medtronic training contract.  *Id.* ¶ 287-88.  But the terms of
those programs are left unspecified, including whether Dr.
Ravuri was reimbursed for work actually performed by Medtronic
or the training reimbursement rates.  There is some difficulty
in drawing an adequate causal connection.

Likewise, there is some evidence of false claims from the
Bend Memorial Clinic.  After completing a training contract at
some point in or after 2005, the Clinic began prescribing
insulin pumps whereas beforehand few such prescriptions were
made.  *Id.* ¶ 275.  Pump shipments to specific Medicare
beneficiaries were identified on dates between 2005 and 2009,
sometimes along with accompanying reimbursements to Bend for
training.  *Id.* ¶ 276, 278.  Notably, Witkin alleges that the

Clinic told Medtronic it would "seriously consider choosing other insulin pumps" if Medtronic reduced its training payment rates, as Medtronic had decided to do in early 2011. *Id*. ¶ 207. But the complaint also alleges that Medtronic agreed to continue training-related reimbursement at the old rate "due to how the contract reads," *id*. ¶ 218, so it appears that Medtronic may have maintained the payments to avoid breaching its contract with the provider.  While this communication strengthens the inference of a remuneration-induced prescription practice – and therefore the existence of false claims - a certain number of inferences are required.  The other allegations are similar. Witkin alleges a fair number of aspects of his kickback claims with particularity but, with the exception of his allegations concerning Dr. Krishnamurthy, generally fails to provide a full set.  Even so, "although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA." *U.S.* ex rel. *Rost* v. *Pfizer, Inc*., 507 F.3d 720, 732 (1st Cir. 2007).  While quantity is no substitute for quality in pleading, Witkin alleges enough examples with enough information in each that, taken together, he is able to "strengthen the inference of fraud beyond possibility." *Id*. at 733.  The complaint, when taken as true, not only supports the inference that false claims were submitted but also provides a

sufficiently sound basis for identifying particular false
claims.

## B.   *Fraudulent Off-Label Promotion*

Witkin alleges that Medtronic made a variety of false
representations regarding the safety and efficacy of using U-500
insulin with its pump.[6]  *See* Sec. Am. Compl. ¶ 310.
Specifically, Medtronic promoted its insulin pumps for use with
U-500 insulin, *Id.* ¶¶ 325-36, even though neither the device nor
the drug is approved for such use.  Medtronic's insulin pump is
approved for use only with lower-concentration U-100 insulin; U-
500 is approved for administration by injection rather than by
pump.  *Id.* ¶¶ 327-29.

Witkin also alleges that Medtronic used false
representations to promote off-label use of adult diabetes
management systems by pediatric patients.  Sec. Am Compl.
¶¶ 424-70.  Medtronic sold integrated diabetes management
systems of insulin pumps paired with glucose sensors.  *Id.*

---

[6] Witkin does not seek to premise FCA liability on claims
influenced merely by *truthful* off-label promotion by Medtronic.
There is a question whether imposing liability in such
circumstances would run afoul of the First Amendment.  *Cf.*
*United States* v. *Caronia*, 703 F.3d 149, 168 (2d Cir. 2012)
(considering that prohibition of truthful off-label promotion
was unconstitutional, but leaving open question whether even
truthful promotion can be used as evidence of intent).  As will
appear more fully below, Witkin fails in any event to plead with
particularity that any promotion by Medtronic — truthful or
otherwise — caused or was material to false claims.  *See* Part
III.B.3, *infra*.

¶¶ 424-25.  These systems were FDA-approved for pediatric use (ages 7 through 17) when the pump was paired with a glucose sensor that alerted patients when their glucose level dropped to a programmed level set no lower than 90 mg/dL; the adult system, by contrast, could be set to alert patients when glucose levels dropped as low as 40 mg/dL.  *Id.* ¶¶ 426-27.  Although the pediatric system will presumably alert more frequently, it is designed to help catch hypoglycemic episodes in children and adolescents.  *Id.* ¶¶ 428-29.

Witkin alleges that Medtronic's fraudulent promotional activities as to both U-500 insulin and pediatric use caused or were material to claims for reimbursement of insulin pumps in circumstances in which use of the pumps was not safe, effective, or reasonably necessary; those claims were thereby false.  As with the remuneration claims, I consider first whether Witkin has adequately alleged any false representations before turning to whether he has pled fraud with adequate particularity.

1.  False Representations

a.  *Use of Pumps with U-500 Insulin*

Medtronic argues that Witkin has failed to allege that any of its promotional activities were false or misleading.  Instead, Medtronic contends Witkin has alleged nothing more than truthful marketing to Type 2 patients, and truthful promotion of studies

supporting the use of insulin pumps in Type 2 patients and with U-500 insulin.

Medtronic seems to ignore large portions of the Amended Complaint.  For example, Witkin alleges that Medtronic took certain "limited studies" advocating the use of pump therapy for obese or insulin-resistant Type 2 diabetes patients (who were likely to need U-500 insulin) and mischaracterized those "limited studies" as "clinical studies."  *E.g.*, Sec. Am. Compl. ¶ 377.  Most of the allegations in the Amended Complaint involve characterization of these "limited" studies as "clinical data" or "clinical evidence" in internal sales training, *e.g.*, *Id*. ¶¶ 378-82, but there is a plausible inference that sales representatives carried this characterization into the field. Whether this nuance in nomenclature or scientific rigor caused or was material to any false claims, or whether Witkin has alleged as much with particularity, is another matter.  But, there is certainly an allegation of falsehood in Medtronic's promotional activity in this respect.

Witkin also recounts an occasion in which Medtronic employees persuaded a Seattle endrocrinologist to conduct an informal study of Type 2 diabetes patients on pump treatment, several of whom used U-500 insulin due to their need for high dosages.  Sec. Am. Compl. ¶ 360.  Witkin alleges that Medtronic, in its later promotion of that study, sugar-coated the positive

results, failed to disclose the difficulties these patients encountered, and failed to disclose the special attention participants in the study received from Medtronic staff to help improve outcomes. *E.g., Id.* ¶¶ 360, 362. These too are plausible allegations of misrepresentations.

The same is true of Witkin's allegations that Medtronic falsely alleged that its product never caused an over-delivery of insulin, Sec. Am. Compl. ¶¶ 387-89, that Medtronic misrepresented the ubiquity of U-500 use in insulin pumps, *id.* ¶¶ 390-92, and that Medtronic promoted the efficacy of its pumps without clinical support, *id.* ¶¶ 393-95.

Witkin also alleges that Medtronic presented the benefits of U-100 insulin to Type 2 patients, knowing most would end up on U-500 insulin. Sec. Am. Compl. ¶¶ 383-86. In this regard, however, Witkin has failed to allege any misrepresentation on Medtronic's part.

### b. *Pediatric Use*

The allegations of Medtronic's fraudulent conduct in its promotion of adult systems for pediatric use are more tenuous. In most instances, Witkin merely alleges that Medtronic failed to promote the pediatric system. *See, e.g.,* Sec. Am. Compl. ¶¶ 434-35, 449-54. But simply providing truthful information about the adult system without any mention of the pediatric system is not false or misleading.

27

However, the Second Amended Complaint sufficiently alleges fraudulent promotional behavior with respect to pediatric use in one way.  Witkin alleges that Medtronic made the pediatric indication of its product a selling point over its competitors but nevertheless (1) used the adult system in demonstrations, (2) failed to explain the differences between the adult and pediatric systems, and (3) used adult systems as the default on order forms knowing that doctors would not know the difference between the adult and pediatric systems.  *E.g.*, Sec. Am. Compl. ¶¶ 437, 442-48, 451-52.  This sort of "bait-and-switch" behavior, to the extent it caused or was material to false claims, may be the basis for FCA liability.  *Cf*. *U.S.* ex rel. *Sanchez* v. *Abuabara*, No. 10-61673-CV, 2012 5193415 at *5 (S.D. Fla. 2012) (collecting "bait-and-switch" cases under the FCA).

### 2.   Falsity of Claims

Medtronic next challenges the adequacy of Witkin's allegations of the falseness of any claims for reimbursement.

#### a.   Use of Pumps with U-500 Insulin

Witkin alleges false claims for reimbursement of the Medtronic pump and of U-500 insulin itself.  Assessing the falsity of claims for reimbursement of the Medtronic pump when used with U-500 insulin is different in some respects from assessing the claims of falsity regarding reimbursement of the

28

insulin itself when used with the Medtronic pump, so I consider them separately.

The insulin pumps at issue are Class II, Category B medical devices.  21 C.F.R. § 880.5725; 42 C.F.R. § 405.201(b); *see* Sec. Am. Compl. ¶ 91.  Although most federal programs will not reimburse for unapproved drug uses, the reimbursement for Category B devices depends on whether they are put to "reasonable and necessary" uses, which in turn depends on whether the use is safe, effective, and appropriate.  *See* 42 U.S.C. § 1395y(a)(1)(A); Medicare Program Integrity Manual § 13.5.1 (rev. ed. 2012) (Medicare); 32 C.F.R. § 199.4(a)(1)(i) (TRICARE); CHAMPVA Policy Manual, ch. 2, § 17.8(III)(A) (2011) (CHAMPVA); *see also Nowak*, 806 F. Supp. 2d at 317-18, 347. *Compare U.S.* ex rel. *Booker* v. *Pfizer, Inc.*, 9 F. Supp. 3d 34, 51-52 (D. Mass. 2014) (finding Medicaid reimbursement for unapproved drug use contingent on state practice, whereas Medicare reimbursement limited to on-label compendium-supported drug uses).

Witkin, in any event, does not rely on the distinctions between drug and device reimbursement practices.  Instead he argues that, when used in tandem, neither the Medtronic pump nor U-500 insulin are safe, effective, or reasonably necessary. Rather than relying solely on the lack of FDA approval for use of U-500 insulin in insulin pumps, Witkin relies on the

considerations behind that determination to argue that such use is not safe and effective.  He highlights concerns about dosing confusion in converting between U-100 and U-500 insulin, Sec. Am. Compl. ¶¶ 337-40, and the difficulty of determining the proper dose for the slower-acting U-500 insulin, *id.* ¶¶ 341-42. He also points to several FDA "Adverse Event Reports" detailing instances in which patients encountered medical problems while using U-500 insulin in insulin pumps.  Sec. Am. Compl. ¶¶ 344-49.

Although Witkin contends these allegations support the inference that use of U-500 in insulin pumps is *never* safe and effective, that argument ignores the fact that "[t]he decision on medical necessity is made by individual physicians exercising independent professional judgment based on the knowledge of their particular patients."  *U.S.* ex rel. *Bennett* v. *Bos. Sci. Corp.*, No. H-07-2467, 2011 WL 1231577, at *26 (S.D. Tex. Mar. 31, 2011); *see* 42 U.S.C. § 1320c-5(a).  Nonetheless, Witkin does plausibly allege that, in at least some if not many instances, use of insulin pumps with U-500 insulin is not safe and effective.  Determinations of medical necessity, and the extent to which Medtronic influenced physicians' judgment of medical necessity, are not appropriate for resolution at the pleading stage.  *Nowak*, 806 F. Supp. 2d at 347 n.22.

Medtronic argues that the *administrators* of federal health care programs ultimately decide whether a claimed device use is medically necessary and thereby reimbursable.  *See* Medicare Program Integrity Manual § 13.5.1.  As a result, Medtronic argues, Witkin has failed to allege the falsity of any claims because he has not alleged that any claims were actually denied by program administrators.  The falsity of claims, however, cannot depend entirely on whether the claim was denied. Medtronic in effect advocates for a rule in which undetectable or undetected fraud, resulting in the unwitting approval of a claim that would not have been approved but for the fraud, cannot be the basis for FCA liability.  I decline to adopt such a rule.

Instead, Medtronic itself admits that a physician's judgment as to medical necessity will be material to the government's payment decision.  It is thus sufficient for purposes of stating a claim that Witkin has alleged that Medtronic's fraudulent promotional practices had a material effect on physicians' determinations as to the safety and efficacy of using insulin pumps with U-500 insulin, because those determinations are inevitably essential to whether a claim is in fact payable.  Witkin has plausibly alleged as much here.

    b.   *Pediatric Use*

Witkin alleges that pediatric use of the adult system is

31

not safe and effective.  He grounds this assertion in data

showing that the device's ability to detect dangerously low

glucose levels in children is more heavily dependent on the

glucose alert settings than in adults.  *See* Sec. Am. Compl.

¶¶ 429-33.  Once again, the important role of professional

judgment means that lack of safety and effectiveness cannot be

alleged categorically.  But Witkin relies on more than mere lack

of FDA approval.  As with use of U-500 insulin, determinations

of medical necessity can again be reserved for later stages.  It

is sufficient that Witkin has plausibly alleged that some uses

of the adult system in children are not reasonably necessary

medically, that Medtronic's fraudulent promotional conduct may

have influenced physicians' judgment as to which system was

reasonably necessary medically, and that resulting claims for

reimbursement were thereby false.[7]

> ### 3.    Pleading Fraud with Particularity
>
> #### a.    *Use of Pumps with U-500 Insulin*

Recognizing that FCA pleadings lacking a "representative

sample of false claims" are usually insufficiently particular,

---

[7] Medtronic mentions in passing that only the insulin pumps, not
the companion glucose sensors, are reimbursable by government
programs.  This is immaterial.  The safety and efficacy of an
insulin pump and the legitimacy of a claim for reimbursement may
depend on the glucose sensor with which it is paired, regardless
of whether the sensor itself is also the object of a claim for
reimbursement.

*Nowak*, 806 F. Supp. 2d at 356, Witkin provides a variety of representative examples of false claims resulting from Medtronic's fraudulent off-label promotion.  Sec. Am. Compl. ¶¶410-23.

I consider the particularity of the pleading especially important here because the allegedly fraudulent promotional activity permits only a weak inference of resulting false claims.  Witkin does not allege, for example, that Medtronic misrepresented the FDA's position on use of U-500 insulin in pumps.  Nor does he allege that Medtronic presented outright its false data to providers — with the exception of the too-implausible-to-be-believed representation that Medtronic products *never* resulted in an over-delivery.  Instead, he pleads fraud by nicks and cuts, alleging a variety of falsehoods whose actual ability to affect medical judgment is less than plausible.

For example, although Witkin alleges that Medtronic was being less than forthcoming about certain studies, there is no allegation that the studies themselves were withheld from physicians.  To the contrary, Witkin alleges that sales representatives were told to "disseminate" the relevant articles.  Sec. Am. Compl. ¶ 377.  With the studies themselves freely available to physicians, one is left to guess whether any physician would rely solely on Medtronic's characterization of

the studies, and whether something like the difference in nomenclature between "clinical evidence" and a "case study" would have a "natural tendency to influence" a physician's medical judgment. *U.S.* ex rel. *Loughren* v. *Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010) (quoting *Neder* v. *United States*, 527 U.S. 1, 16 (1999)).

With that in mind, I find that relator failed to plead this scheme with the requisite level of particularity. He comes closest, once again, with claims from a patient of Dr. Krishnamurthy, although on these claims the allegations are more fragmentary. The complaint alleges that Relator and other Medtronic employees misled her by misrepresenting the strength of studies of U-500 insulin, the national usage of U-500, and failing to disclose the risks of U-500. Sec. Am. Compl. ¶ 416. Promotion also involved the use of iPro clinics, although it is not clear how those clinics involved the promotion of U-500 insulin in pumps. *Id.* ¶ 417. The timing of these misrepresentations is not provided, with the exception of a conversation concerning iPros on January 21, 2010. *Id.* Thereafter, Dr. Krishnamurthy allegedly began widely using U-500 in insulin pumps, including with her many patients on government health care programs. *Id.* ¶ 418. One particular patient on Medicare, JW, is identified as receiving a pump for use with U-500 insulin on January 24, 2011. *Id.*

34

Other than JW, the other examples provided are each clearly insufficient.  For example, the complaint might in one instance detail the off-label promotion efforts made with respect to a doctor, but identify no specific claims resulting from that promotion or government health insurance beneficiaries being prescribed U-500 insulin.  Sec. Am. Compl. ¶ 413-15.  Other claims are identified, but for non-government beneficiaries. *Id.* ¶¶ 419, 421.  Witkin largely fails to connect his allegations of fraudulent promotion of insulin pumps and U-500 insulin to any false claims for reimbursement of insulin pumps or U-500 insulin.  The single example of Dr. Krishnamurthy's patient JW, which itself has certain gaps in its particularity – such as the date of the promotion and the identity of the promoters, as well as the claim to Medicare itself – is not enough, standing alone, to constitute a "representative sample" of false claims when the other examples are so lacking. Adequately pleading that the misrepresentations alleged here could be material to a physician's judgment, and that they resulted in claims involving uses of insulin pumps or U-500 insulin that were not reasonably necessary medically, requires a good deal more particularity than is found in the Second Amended Complaint.

b.   *Pediatric Use*

Particularized allegations regarding the use of Medtronic diabetes management systems by pediatric patients — with respect to both the underlying fraudulent promotion and the false claims themselves — are utterly lacking.  Sec. Am. Compl. ¶ 481-91. Witkin makes no meaningful connection between the alleged claims for reimbursement of Medtronic products used by pediatric patients and Medtronic's fraudulent off-label activity. Moreover, there is no particular allegation that any of the claims resulted from the sort of "bait-and-switch" approach that, as I concluded above, constitutes the only form of fraudulent promotional activity alleged.

The complaint largely alleges that particular named physicians were the subject of Medtronic promotional activity, had pediatric patients and government-insured patients, and prescribed insulin pumps, without connecting those allegations. *E.g. id.* ¶ 485.  The most particular representative example alleges that a Dr. McCarthy prescribed a pump for his Medicaid beneficiary patient M.W., aged 10, who was shipped an adult pump on July 7, 2009.  *Id.* ¶ 486.  No detail at all is provided as to which promotional activities were directed at Dr. McCarthy, much less which led to a prescription for M.W. Witkin has alleged an elaborate fraudulent scheme with some detail, but without particularity as to the "who, what, where, and when" of the

underlying fraudulent promotion or eventual false claims. *Duxbury*, 579 F.3d at 30.  Witkin thus cannot maintain his claims for FCA liability premised on Medtronic's off-label promotion.

## C.     *Ineligible/Unnecessary Pumps for Type 2 Patients*

To qualify for Medicare coverage of insulin pumps, Type 2 diabetes patients must satisfy strict criteria, including (1) a documented frequency of glucose self-testing an average of at least 4 times per day during the 2 months prior to initiation of the insulin pump, and (2) a fasting level of C-peptide (a byproduct of insulin produced by the pancreas) less than or equal to 110 percent of the lower limit of normal, and a fasting blood sugar level less than or equal to 225 mg/dL.  Sec. Am. Compl. ¶¶ 494-97.  Witkin alleges that Medtronic helped patients prepare the required certifications that their use of insulin pumps was medically necessary, after which Medtronic would supply the certification to doctors for their signature.  *Id*. ¶ 513-20.  In the process, Witkin alleges, Medtronic aided Type 2 patients in fabricating their eligibility criteria for pump therapy.

Witkin offers a variety of allegations to this end.  For example, Witkin alleges that Medtronic sales representatives were trained to elicit false information from patients by implying that certain responses to their questions were necessary to qualify for coverage.  Sec. Am. Compl. ¶¶ 519.

Witkin alleges two specific ways in which Medtronic taught patients to falsify their C-peptide tests.  The first involved instructing patients to go on a carbohydrate fast for several days before the test.  *Id*. ¶¶ 527-29.  The second involved inducing hypoglycemia, during which the body stops producing insulin, and thereby ensuring low C-peptide levels.  *Id*. ¶¶ 530-34.

These allegations fail solely on the ground that they do not allege fraud with adequate particularity.  With respect to eliciting false information from patients, the Second Amended Complaint lacks any particularized allegations of patients targeted or of when or what information was falsified, let alone allegations of doctors who endorsed the fabricated certifications of medical necessity and thereafter made false claims to government health care programs.  Sec. Am. Compl. ¶ 546-47.

There are also no particularized allegations of fraud regarding the technique of inducing hypoglecemia to produce a sufficiently low C-peptide test.  Witkin, to his credit, names specific managers at Medtronic who he alleges taught him this technique, and who, he claims, use the technique widely themselves.  *See* Sec. Am. Compl. ¶¶ 528-34.  But Witkin fails to allege any specific instances of patients or providers who used this technique or eventually made false claims.

There is, however, a slender reed of particularity as to the use of carbohydrate fasting to falsify C-peptide tests. Witkin coached a patient he calls "G.D." to carbohydrate fast, after which his C-peptides dropped to levels qualifying him for coverage.  Sec. Am. Compl. ¶ 549.  Witkin also alleges a claim on Medicare by G.D. for a pump shipped on July 28, 2008.  *Id*. Here, Witkin has pled with particularity the connection between Medtronic's alleged fraudulent activity and false claims to the government.

However, taking the allegations of the Amended Complaint as a whole, it is not apparent that carbohydrate fasting is fraudulent — either generally or in this particular instance. The Medicare guidelines referenced by Witkin, after all, require a "*fasting* C-peptide level" of less than 1.1 times the lower limit of normal.  *See* Sec. Am. Compl. ¶¶ 526.  Witkin does not explain how or why a carbohydrate fast is unusual, let alone fraudulent, when the guidelines ask for post-fast measurements. Although, this pleading is sufficiently particular to put Medtronic on notice of the charges of fraud against it, Witkin does not "strengthen the inference of fraud beyond possibility" with respect to the illegitimacy of carbohydrate fasting.  507 F.3d at 733.  As a result, even Witkin's specific example of Medtronic-coached carbohydrate fasting and resulting claim to a

government payor fails to plead fraud with adequate
particularity.

For these reasons, Witkin cannot maintain his claims for
FCA liability premised on Medtronic's alleged inducement of Type
2 patients to order pumps for which they were ineligible or
which were otherwise unnecessary.

## IV. RETALIATION

### A.   *Relevant Factual Background*

Because Witkin's retaliation claims present a largely
independent set of issues, I begin with a brief summary of the
relevant facts.  Witkin complained on several occasions to
Medtronic District Field Manager Mike Ware that he felt it was
inappropriate for him to be conducting iPro clinics and fitting
patients with iPro devices without the assistance of medical
staff.  *E.g.*, Sec. Am. Compl. ¶ 566-68, 572-73.  He also told
Ware that "providing physicians with a service which they did
not perform but for which they could claim payment 'sounded like
a kickback.'"  *Id.* ¶ 569.  Witkin alleges that Ware retaliated
against him for these complaints by giving him low performance
ratings, *e.g.*, *id.* ¶ 570, and writing a "Letter of Concern" that
Witkin had involved nurses in his iPro clinics, *id.* ¶ 578.

In late 2010, Witkin contacted and eventually filed a
formal complaint with the FDA, raising his concerns about
running iPro clinics, Medtronic's fraudulent sales and marketing

practices, and potential kickbacks being paid to physicians. Sec. Am. Compl. ¶ 579-80.  On January 7, 2011, Ware placed Witkin on a "Corrective Action Plan," which Witkin also alleges was done in retaliation for his earlier objections regarding iPro clinics.  Shortly thereafter, Witkin informed the Oregon Medical Board about his concerns with respect to Medtronic staff performing medical procedures in iPro clinics.  *Id.* ¶ 552.

On February 1, 2011, Witkin informed Celeste Ortiz, Medtronic MiniMed's President of Human Resources, that he thought Ware was trying to push him out of the company; he alerted Ortiz to data demonstrating that he outperformed other Territory Managers who had not been placed on a Corrective Action Plan.  Am. Compl. ¶ 585.  Following Witkin's complaints, Ware placed Territory Manager Mark Collingwood on a Corrective Action Plan similar to Witkin's.  *Id.* ¶ 592.  On February 9, 2011, Witkin sent a memorandum to Reuben Mjaanes, Medtronic's Principal Legal Counsel, reporting his concerns about the administration of iPro clinics and potential kickbacks to physicians.  *Id.* ¶ 588.

Witkin was terminated on February 28, 2011.  Sec. Am. Compl. ¶ 591.  He asserts that he and Collingwood both performed strongly but were unable to meet the goals set for them under the Corrective Action Plan.  *Id.* ¶ 592.  Nevertheless, no adverse action was taken against Collingwood; Witkin, however,

was terminated without further opportunity to improve his performance. *Id.*

## B.    *FCA Retaliation Claim*

To state a claim for retaliation under the FCA, 31 U.S.C. § 3730(h), Witkin must plead that his conduct was protected under the FCA, that Medtronic knew he was engaged in such conduct, and that Medtronic discharged or discriminated against him because of his protected conduct. *Karvelas*, 360 F.3d at 235.

The First Circuit broadly construes protected activity under the FCA to include "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Karvelas*, 360 F.3d at 236; *accord U.S.* ex rel. *Provuncher* v. *Angioscore, Inc.*, CIV.A. 09-12176-RGS, 2012 WL 1514844, at *5 (D. Mass. May 1, 2012). That said, investigation of "regulatory failures" that do not involve "investigation or reporting of false or fraudulent claims" is not protected. *Karvelas*, 360 F.3d at 237.

Witkin's complaints about the impropriety of performing iPro procedures without the assistance of trained medical staff are divorced from any false claims and thus do not constitute FCA-protected activity. However, Witkin's complaints also involved concerns about kickbacks and other fraudulent conduct directed at physicians to encourage off-label use of Medtronic

42

devices.  Such fraudulent conduct is exactly the sort of
activity that "reasonably could lead" to false claims by the
objects of that conduct, and is thus protected conduct for
purposes of the FCA.  *Cf. U.S.* ex rel. *Gobble* v. *Forest Labs.,
Inc.*, 729 F. Supp. 2d 446, 450 (D. Mass. 2010) (finding reports
of off-label promotion and kickbacks protected FCA activity).

As to the remaining elements, Medtronic's awareness of
Witkin's activity is more than plausible based on the allegation
that he reported his concerns not only to Ware, but also MiniMed
Human Resources and Medtronic legal counsel.  Witkin also
adequately alleges that he was discharged because of his
protected conduct.  The proximity between Witkin's protected
activity and his termination after years as a "top performer,"
Sec. Am. Compl. ¶ 563, 591, may alone be sufficient.  *Cf. U.S.*
ex rel. *Bierman* v. *Orthofix Int'l, N.V.*, 748 F. Supp. 2d 117,
122 (D. Mass. 2010).  Witkin, however, also strengthens the
inference of discrimination by directly comparing his treatment
with that of another Territory Manager, Collingwood, who had
allegedly similar performance credentials.

I recognize that Witkin has alleged a variety of activity
that was the basis for Medtronic retaliating against him, some
of which was FCA-protected (such as the reports of fraudulent
promotion and kickbacks) and some of which was not (such as
reporting concerns about lay Medtronic staff performing medical

procedures).  Nevertheless, Witkin's allegations of retaliation
need not meet the heightened pleading standards of Rule 9(b).
*Karvelas*, 360 F.3d at 238 n.23.  He has adequately pled a FCA
retaliation claim sufficient to overcome a motion to dismiss.

## C.   *State-Specific Issues*

Witkin also raises wrongful termination claims under the
statutes and common law of Oregon and California.  Medtronic
raises two challenges to these claims.

### 1.   Oregon

Medtronic first argues that Witkin's common law wrongful
termination claim is precluded because his statutory claim under
Or. Rev. Stat. Ann. § 659A.199 provides an adequate remedy at
law.  Judges in the District of Oregon seem generally to agree
with Medtronic's position.  *See, e.g., Neighorn* v. *Quest Health
Care*, 870 F. Supp. 2d 1069, 1107 (D. Or. 2012); *Reid* v.
*Evergreen Aviation Ground Logistics Enterp. Inc.*, No. 07-1641-
AC, 2009 WL 136019, at *16 (D. Or. Jan. 20, 2009) (collecting
cases).

Witkin points to one decision, however, from the Oregon
Court of Appeals, finding that a common law wrongful discharge
claim is not extinguished unless an existing statutory remedy is
adequate *and* there is some indication of legislative intent to
preclude the common law claim.  *Olsen* v. *Deschutes Cnty.*, 127
P.3d 655, 660 (Or. Ct. App. 2006).  The state whistleblower law

expressly provides that its remedies are "in addition to any common law remedy" available to the employee.  Or. Rev. Stat. Ann. § 659A.199(2).  Witkin also notes that the Oregon Supreme Court has declined review in *Olsen*, 136 P.3d 1123 (Or. 2006), which he argues is a straw in the wind as to the Court's views on the issue.

I am, to be sure, obligated to adhere to the rule that the Oregon Supreme Court would likely follow.  *See Kathios* v. *Gen. Motors Corp.*, 862 F.2d 944, 949 (1st Cir. 1988).  The most recent authoritative word from that Court favors Medtronic's position.  In *Dunwoody* v. *Handskill Corp.*, 60 P.3d 1135 (Or. 2003), the Court made clear that "wrongful discharge is an interstitial tort, designed to fill a remedial gap where a discharge in violation of public policy would be left unvindicated."  *Id.* at 1139.  The tort thus does not require legislative action to be extinguished, but exists only to fill "remedial gap[s]" that may exist.  Permitting Witkin to pursue his common law wrongful discharge action when he has an adequate statutory remedy would be at odds with the purpose of the common law tort under Oregon law.  *Cf. Reid*, 2009 WL 136019, at *18. *See also Shaw* v. *Action Financial Servs., LLC*, No. 1:14-CV-00469-CL, 2014 WL 4404961 at *3 (D. Or. Sept. 5, 2014) (describing *Olsen* as "inconsistent with Oregon Supreme Court

precedent"). Accordingly, I will dismiss the Oregon wrongful discharge claim.

### 2. California

Medtronic next argues that, as an Oregon resident who performed his job duties substantially within Oregon, Witkin cannot bring claims under California employment law.

The connection to California in this case is Medtronic MiniMed, which has its principal place of business in California. Sec. Am. Compl. ¶ 48. Witkin alleges that he had frequent business contact with MiniMed's corporate headquarters, brought customers to the California headquarters twice a year, and participated in conference calls run from the California headquarters. *Id.* ¶ 564. Witkin also alleges that he was notified of his termination by both Ware and a MiniMed Human Resources representative in California. *Id.* ¶ 591. He further alleges that "MiniMed officials in California participated in the decision to terminate [his] employment and actually approved his termination." *Id.*

The thrust of Medtronic's argument appears to be that California law does not seek to protect employees conducting their business outside of California, even when dealing with a California-based company. It is not clear whether Medtronic also means to invoke constitutional due process concerns. In any event, I decline to dismiss Witkin's wrongful termination

claim under California law based on Medtronic's cursory argument
in a footnote and citation to a case involving the construction
of a California statute not invoked by Witkin.   *Cf. Campbell* v.
*Arco Marine, Inc.*, 50 Cal. Rptr. 2d 626, 627-28 (Cal. Ct. App.
1996) (concluding California Fair Employment and Housing Act did
not extend to protect non-resident "whose employment duties were
performed, for the most part, outside the boundaries of the
state, and whose injuries are based on behavior occurring
outside the state," in part due to constitutional concerns).
Generally, "arguments raised only in a footnote or in a
perfunctory manner are waived."  *Nat'l Foreign Trade Council* v.
*Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999); *aff'd sub nom.*
*Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363 (2000).

Moreover, although Witkin alleges he was an employee of
Medtronic, not MiniMed, he also alleges that California-based
MiniMed officials had a direct role in his termination.  At the
very least, the issue deserves further factual development,
after which Medtronic will perhaps undertake to invest the time
necessary to brief the issue adequately when raising it with the
court.

## V.   STATE INSURANCE FRAUD STATUTES

The Second Amended Complaint includes a count asserting
claims under the California Insurance Frauds Prevention Act,

Cal. Ins. Code § 1871.7, and the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92.  These claims are in addition to a separate count pleading violations of state False Claims Acts, including those of California and Illinois.  In their motion to dismiss practice, however, the parties appear not to discuss these acts at all.  Because these statutes are independent from their states' False Claims Act analogues, I am unwilling to simply assume, without argument, that their effect is coterminous with that of the federal False Claims Act, as the parties implicitly do.  I suggest further motion practice as necessary to determine the proper treatment of the third count of the Second Amended Complaint.

## VI. CONCLUSION

For the reasons set forth more fully above, defendants' motion to dismiss is GRANTED as to Counts I and II with respect to relator's claims concerning fraudulent promotion and ineligible pump orders and as to Count V.  The motion to dismiss is denied as to Counts I and II with respect to kickback-related claims and as to Counts III, IV, and VI.

It is FURTHER ORDERED

That the parties submit on or before June 10, 2016 a joint proposed scheduling order setting forth dates certain for

discovery, summary judgment practice and any other dates

necessary to be established to bring this case to judgment.


/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE