UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. ADAM WITKIN, | * * * | |
| Plaintiffs and Relator, | * | |
| v. | * * | Civil Action No. 1:11-cv-10790-IT |
| MEDTRONIC, INC., and MEDTRONIC MINIMED, INC., | * * * | |
| Defendants. | * | |

MEMORANDUM & ORDER

March 31, 2024

TALWANI, D.J.

Relator Adam Witkin ("Relator" or "Witkin") brings this *qui tam* action on behalf of the federal government, 26 states, and the District of Columbia against his former employer, Medtronic, Inc., and its wholly-owned subsidiary, Medtronic MiniMed, Inc. (collectively, "Medtronic" or "Defendant"). Relator claims that Medtronic offered and paid remuneration to doctors to induce referrals of Medtronic's insulin pump, in violation of the Stark Law and the Anti-Kickback Statute ("AKS"). Relator asserts that Medtronic, knowing that its targeted providers would prescribe insulin pumps to government healthcare beneficiaries, therefore violated the federal False Claims Act ("FCA") as well as various analogous state acts (together, the "False Claims Acts"). Witkin also brings claims on his own behalf for retaliation and wrongful termination against Medtronic. Pending before the court is Medtronic's Motion for Summary Judgment as to Witkin's False Claims Act Claims [Doc. No. 175]. For the reasons set forth herein, the Motion is GRANTED in part and DENIED in part.[1]

---

[1] Also pending is Defendant's Motion for Summary Judgment as to Witkin's Retaliation Claims [Doc. No. 172], which the court addresses in a separate order.

## I.      Procedural Background as to the *Qui Tam* Claims

Witkin initiated this action by filing a sealed *qui tam* complaint alleging that Medtronic had violated federal and state False Claims Acts. Compl. [Doc. No. 1]. After the matter was unsealed, Witkin filed the operative <u>Second Amended Complaint</u> ("Complaint") [Doc. No. 74].

The court granted in part and denied in part Medtronic's motion to dismiss. <u>United States v. Medtronic, Inc.</u>, 189 F. Supp. 3d 259, 282-83 (D. Mass. 2016). On the *qui tam* claims, the court allowed Count I for violations of the federal FCA, 31 U.S.C. § 3729(a)(1)(A), (B), and (G), and Count II for violations of state False Claims Acts to go forward on three theories of false claims being submitted to federal healthcare programs: (1) that Medtronic engaged in a scheme to pay above fair market value for pump training services to induce physicians to prescribe Medtronic pumps, which were then billed to the government, and therefore paid remuneration to physicians outside the AKS and Stark Law safe harbors; (2) that Medtronic engaged in a scheme to systematically provide and encourage doctors to bill for free Medtronic-performed "iPro clinics" as remuneration to induce them to prescribe Medtronic pumps, which were then billed to the government; and (3) that Medtronic systematically and as a planned strategy, provided other free incentives such as free sample devices, meals, travel, and accommodations to induce physicians to prescribe Medtronic insulin pumps, which were then billed to the government. 189 F. Supp. 3d at 271.[2]

The court implemented a phased discovery schedule,[3] and Medtronic filed the pending motion for summary judgment following Phase One discovery. Medtronic urges the court to

---

[2] The motion to dismiss was denied as to Count III, which sought damages under California and Illinois insurance fraud statutes, but Relator subsequently dismissed Count III. Not. Voluntary Dismissal [Doc No. 103].

[3] Under the court's scheduling order, discovery on Relator's Stark Law, AKS, and FCA claims was (except for a limited exception) for the time period January 1, 2007, to December 31, 2014,

grant summary judgment on Witkin's remaining *qui tam* claims based on a theory of but-for

causation in the AKS context. Medtronic further argues that the *qui tam* claims fail because

Relator cannot show an underlying violation of the Anti-Kickback Statute or the Stark Law or

that Medtronic knowingly caused the submission of any specific false claims for payment to

government healthcare programs. Def. Mem. FCA/AKS 1 [Doc No. 176]. Witkin filed an

Opposition to the motion. Rel. Opp. Summ. J. as to Counts IV-VI ("Rel. Opp. FCA/AKS") [Doc.

No. 188].

At a first summary judgment hearing, the court requested additional materials from

Relator, see Clerk's Notes [Doc. No. 217]; granted his Motion for Phase Two Discovery [Doc.

No. 190], but only to the extent that he was permitted to file certain Centers for Medicare &

Medicaid Services materials; and denied from the bench Medtronic's Motion to Strike the

Testimony of Kathy McNamara [Doc. No. 203], Witkin's proffered expert. Clerk's Notes [Doc.

No. 217].[4] Witkin thereafter filed notices of supplemental authorities [Doc. Nos. 227, 232, 234],

Medtronic filed responses [Doc. Nos. 228, 233, 238], and the government filed a Statement of

---

and was limited to "Relator's [sales] territory in the State of Oregon and the alleged examples relating to the specific healthcare providers in Paragraphs 176, 205, 234, 236, and 309 of the Second Amended Complaint." Scheduling Order ¶ 2(b) [Doc. No. 98]. The "specific healthcare providers" discussed in those paragraphs include doctors who did not maintain practices in the state of Oregon, but were based out of Las Vegas, NV (Dr. Berelowitz); Cherry Hill, NJ (Cooper Endo Clinic); Tulsa, OK (Dr. Flesner); Cherokee, NC (Dr. Habas); Los Angeles, CA (West Endocrinology Group); Portland, ME (Dr. Edelman); Olympia, WA (Dr. Kline); Vancouver, WA (Drs. Orr and Decker); Longview, WA (Dr. Kirkpatrick); and Centralia, WA (Dr. Chehalis). Second Amended Complaint ¶¶ 176, 205, 234, 236, 309 [Doc. No. 74].

[4] Federal Rule of Evidence 702 has since been amended to clarify the standard of reliability required for an expert's opinion to reach the jury, see Pub. L. No. 93-595 § 1 (eff. Dec. 1, 2023), but the amendment does not require a different result. As relevant to Medtronic's arguments in its Motion to Strike [Doc. No. 203], the court concludes that McNamara's testimony is "more likely than not" "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case," and thus may still be considered even under the revised Rule.

Interest [Doc. No. 235]. After the case was transferred to this session, the court ordered

supplemental briefing on legal developments surrounding the False Claims Act and Anti-

Kickback Statute, Elec. Order [Doc. No. 248], which the parties provided. [Doc. Nos. 249, 251].

The government also filed a Statement of Interest [Doc. No. 250].

## II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st

Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving

party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an

essential element of its claim. Id. at 323-24.

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of

material fact remains. Id. at 324.  The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] upon mere allegation[s] or denials of [the] pleadings."

Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. <u>Anderson</u>, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." <u>Anderson</u>, 477 U.S. at 255.

**III.     Defendant's Motion for Summary Judgment of Qui Tam Claims**

A.   *Factual Background*

Relator asserts that Medtronic's improper behavior spanned a seven-year period from 2007 through 2014; involved dozens of Medtronic sales representatives, insulin pump trainers, and physicians; and covered a wide geographic swath of the United States.[5] The theories of remuneration on which Relator bases his False Claims Act/Anti-Kickback Statute claims rely heavily on evidence of Medtronic representatives' in-office behaviors, Medtronic's marketing and sales materials and practices, and Medtronic representatives' communications with insulin pump-prescribing physicians. As a result, the court considers a particularly detailed factual record at the summary judgment stage.

---

[5] Notwithstanding these nationwide allegations, Phase One Discovery was focused on Relator's sales territory in the Northwest.

1.   Medtronic Products

The Diabetes Group of Medtronic, formerly known as Medtronic MiniMed, provides

diabetes services and devices, including continuous glucose monitoring devices and insulin

pump therapy systems. Rel. Resp. Def. SMF ¶ 2 [Doc. No. 189].

a.   Insulin Pumps

From 2008 until 2014, Medtronic manufactured and sold several models of insulin

pumps. Insulin pumps are computerized devices that assist patients with diabetes by calculating

patient-specific insulin doses, delivering insulin to the patient, and recording the patient's

glucose levels. Def. SMF, Ex. 2 [Doc. No. 177-2]. Medtronic, like other medical device

companies, is required to provide insulin pump product training to patients using such pumps

who are beneficiaries of Medicare and the Centers for Medicare & Medicaid Services ("CMS").

More specifically, CMS requires companies like Medtronic to "provide, or coordinate the

provision of, appropriate information related to the set-up . . . , features, routine use,

troubleshooting, cleaning, infection control practices, and maintenance of all equipment and

item(s) provided." Rel. Resp. Def. SMF ¶ 5 [Doc. No. 189]. As a result of this requirement, for

Medtronic to receive Medicare reimbursement for insulin pumps, Medtronic must show that it

(or a delegate) trained the Medicare patient on how to use the device. Id. ¶ 6.

b.   iPro Devices

From 2008 until 2014, Medtronic also manufactured and sold several continuous glucose

monitoring devices. Id. ¶ 66. These devices help a patient (and the patient's physician) identify

patterns in the patient's glucose levels. Def. SMF, Ex. 2 [Doc. No. 177-2]. The continuous

glucose monitoring device that is discussed in this case, the iPro2/iPro CGM ("iPro"), was first

approved by the Food and Drug Administration ("FDA") in 2008. Rel. Resp. Def. SMF ¶ 67 [Doc. No. 189].

Generally, a patient is fitted with the iPro at a provider's office, wears the iPro for three days, then returns to the provider's office for professional interpretation of the data downloaded from the device. Id. ¶¶ 76, 78-79. The glucose sensor, which measures glucose levels, is placed under the patient's skin, and the iPro takes up to 288 blood glucose readings per day. Id. ¶ 74. The iPro Recorder, which attaches to the glucose sensor, records and stores the data. Id. ¶ 75. While patients wear the iPro, they also take four "fingersticks" per day and record their daily activities on a log sheet. Id. ¶ 78.

2.    Insulin Pump Training[6]

Medtronic provided pump training to patients both when they were prescribed a Medtronic pump for the first time and when they received a new or upgraded insulin pump. Def. Resp. Rel. SMF ¶ 8 [Doc. No. 206].

a.    Personnel

At all relevant times, Medtronic product training sessions were led by either a Medtronic Diabetes Clinical Manager ("Medtronic Manager") or a Certified Product Trainer ("Trainer").[7] Trainers were not employed by Medtronic but could be employed by a physician's office or health care center. Rel. Resp. Def. SMF ¶ 11 [Doc. No. 189]. Medtronic required Trainers to be licensed health care professionals or hold a master's degree in one of several healthcare-related

---

[6] The facts recited in this Section III.A.2 are relevant to Relator's first theory of remuneration: that Medtronic was improperly compensating physicians or physicians' offices who provided insulin pump training on Medtronic devices.

[7] Parties refer to these positions as "DCM" and "CPT" in their Statements of Facts. Because these are similar or identical to other acronyms used by the parties, the court has provided alternate shorthand definitions of these roles.

disciplines and to complete a training and certification process. Id.; Def. SMF, Ex. 2 [Doc. No. 177-2]. When Medtronic used a Trainer to train patients, Medtronic entered into a contract either with that person individually or through a "center contract" with the physician's office that employed the Trainer. Rel. Resp. Def. SMF ¶ 11 [Doc. No. 189].

   In contrast, Medtronic Managers were Medtronic employees. As Medtronic employees, they also had other job responsibilities, including providing technical assistance on Medtronic products in physicians' offices, answering patient and provider questions about Medtronic products, and overseeing the administration of patient training on Medtronic products. Id. ¶ 12.

### b. Training Details

   Medtronic's insulin pump training program consisted of three sessions: pre-training,[8] pump-start training,[9] and follow-up training.[10] Id. ¶ 14. According to the forms used by the Managers and Trainers, pre-training could range from fifteen minutes up to two hours; pump-

---

[8] Pre-training focused on the basics of Medtronic pump therapy, including basal and bolus insulin therapy with the pump. Rel. Resp. Def. SMF ¶ 16, 20 [Doc. No. 189]; Rel. Resp. Def. SMF, Ex. 18 [Doc. No. 191-18]. The Medtronic Manager or the Trainer could, but was not required to, work with the patient to practice using the pump with a saline solution, and/or train the patient how to treat hypoglycemia and hyperglycemia with the insulin pump. Rel. Resp. Def. SMF ¶¶ 17-18 [Doc. No. 189]. The Medtronic Manager or the Trainer would also educate the patient about the risks of pump therapy and how to treat potential complications from pump use. Id. ¶ 19.

[9] During the pump-start session, patients reviewed their lessons, learned how to care for and replace the insulin infusion set, and learned how to troubleshoot issues with the insulin pump. Rel. Resp. Def. SMF ¶ 23 [Doc. No. 189]. The patients were trained on proper battery insertion and the device's therapy management systems. Id. ¶¶ 24-25. Pump-start training also included follow-up calls with patients to answer questions and check on progress. Def. SMF, Exs. 10-11 (declarations of Trainers Shearer and Koopman) [Doc. Nos. 177-10; 177-11].

[10] Follow-up training occurred one to three days after the pump-start training. Rel. Resp. Def. SMF ¶ 27 [Doc. No. 189]. The Trainers or Medtronic Managers reviewed information covered in the previous sessions and also assessed basal rates established with the patient based on the few days of pump use. Id. ¶ 27. In addition, the Trainers would work through issues that may have arisen with the patient and discussed any problems with the insulin transmission site. Id. ¶ 28.

start training typically ranged from one to three hours; and follow-up training typically ranged from fifteen minutes to two hours. Id. ¶¶ 20-22, 29; Rel. Resp. Def. SMF, Ex. 18 [Doc. No. 191-18]. However, Medtronic did not officially track these times. Rel. Resp. Def. SMF ¶¶ 20-22, 29 [Doc. No. 189].

c.   Payment

Medtronic paid for Trainer-led pump training, pre-training, and post-training according to a uniform rate schedule that was incorporated into each contract with the Trainer or health care center. Id. ¶ 38. The agreements set forth a one-year term, which automatically renewed for successive one-year terms and defined the reimbursement rates and associated time periods. Def. SMF, Exs. 14-17 [Doc. Nos. 177-14–177-17]. Medtronic reimbursed pre-pump and follow-up training at an hourly rate, and paid a single, flat rate for pump-start training. Rel. Resp. Def. SMF ¶¶ 39-40 [Doc. No. 189].

From 2007 through October 2013, Medtronic's contracts provided for payment of $50 per hour for pre-pump and follow-up pump training, and a flat fixed rate of $225 for a pump-start session. Id. ¶ 42; Def. SMF, Ex. 14 (2009 Contract) [Doc. No. 177-14].[11] From October 2013 through December 2014, Medtronic's contracts provided for payment of $75 per hour for pre-

---

[11] Relator disputes Medtronic's claims about its rates for individual training by pointing to the group training rates, which could be billed at a lower rate per patient. Rel. Resp. Def. SMF ¶ 42 [Doc. No. 189]. But Medtronic does not claim that its group billing rate was equivalent to its individual rate, and Relator does not cite to evidence of Medtronic contracts stipulating rates higher than $50 an hour for individual training from 2007 to October 2013. Relator does cite to an exhibit, titled "Medtronic CPT & Center Rates," that has no date associated with the rate schedule, and provides for an upper limit of $100 to be paid for 2 hours of training (i.e., $50 an hour). Id., Ex. 18 [Doc. No. 191-18]. Rather, Relator's primary contention seems to be that Medtronic was not abiding by the payments provided for in its contracts—not that the contracts themselves were inherently illegal. See id. ¶ 46 (citing patient form where Tonya Koopman, a Trainer employed by Bend Medical Center, billed $100/hour for training conducted in 2012) [Doc. No. 191-33].

pump and follow-up pump training and a flat fixed rate of $250 for pump-starting training. Rel. Resp. Def. SMF ¶ 43 [Doc. No. 189]; Def. SMF, Ex. 16 (2013 Contract) [Doc. No. 177-16]. Medtronic's agreements also generally provided for group training sessions at a lower rate per patient. Rel. Resp. Def. SMF ¶ 42 [Doc. No. 189].

Medtronic capped training sessions that were reimbursed at an hourly rate at two hours. Def. SMF ¶ 44 [Doc. No. 177]. Medtronic required prior approval to reimburse sessions charged at an hourly rate that lasted longer than two hours. Rel. Resp. Def. SMF, Ex. 29 [Doc. No. 191-29].

Medtronic also paid Trainers or the health care centers that employed them a $225 flat fee for upgrade pump training and up to $100 for follow-up training. Def. Resp. Rel. SMF ¶ 230 [Doc. No. 206]. However, Medtronic did not pay for training when the pump order was an in-warranty replacement. Id. ¶ 232.

Medtronic's contracts with Trainers and with associated health care centers paid out at a similar rate to other insulin pump manufacturers' contracts. Id. ¶ 56. On several occasions, Medtronic made efforts to reduce its reimbursement rates with its providers, and some of these providers resisted or threatened to start prescribing a competitor's pump instead of Medtronic's pump: In those cases, Medtronic responded by withdrawing its request to change the rates.[12]

---

[12] For example, when Medtronic asked Children's Hospital Orange County in Southern California to limit its hours to bring training down to $275 per patient, the Hospital informed Medtronic that competing vendors compensated their healthcare providers at $450 per patient and that "if [the healthcare providers] cannot bill for pre-pump training, patient safety will be compromised[,] and they will stop prescribing [Medtronic] pumps." Rel. Resp. Def. SMF, Ex. 44 at 7 [Doc. No. 191-44]. Similarly, Medtronic attempted to limit its payment for upgrade training at Bend Memorial Clinic in Oregon. Rel. Resp. Def. SMF, Ex. 26 [Doc. No. 191-26]. In response, Trainer Tonya Koopman, Bend Memorial's representative in this email exchange, expressed that "it would definitely lead us to seriously consider choosing other insulin pumps for our patient population" if the training payment system changed in the way that Medtronic had suggested. Id. After Koopman's email, Medtronic decided to "continue to honor how things have

d.   Medicare's Diabetes Self-Management Training

Medicare pays for up to 10 hours of accredited diabetes self-management training services and for up to two hours of follow-up training in subsequent calendar years, for a diabetic beneficiary who uses an insulin pump. Rel. Resp. Def. SMF ¶¶ 61-64 [Doc. No. 189]; Def. Resp. Rel. SMF ¶ 215 [Doc. No. 206].[13] This training is intended to cover "instructions in self-monitoring of blood glucose; education about diet and exercise; an insulin treatment plan developed specifically for the patient who is insulin-dependent; and motivation for patients to use the skill for self-management." Def. Resp. Rel. SMF ¶ 216 [Doc. No. 206] (citing Medicare Benefit Policy Manual, ch. 15 § 300). Medicare requires that these sessions be ordered by a physician, accredited, documented, and, apart from one hour, conducted in a group setting. Id. ¶ 217. Medtronic was aware that Medicare's reimbursement for training fees was a potential source of revenue in connection with the patients using its insulin pump therapy. Id. ¶ 218.

Medicare encourages group training for diabetes self-management training services, requiring that 90% of a patient's maximum training time be conducted in a group setting unless the need for individual training was identified by the physician. Id. ¶ 226. In line with Medicare's guidance, Medtronic told its Medtronic Managers to conduct group trainings to maximize efficiency and minimize cost. Id. ¶ 229. However, according to Medtronic's training reimbursement data, most Trainers who were paid via contracts between Medtronic and health care centers trained patients on an individualized, rather than group, basis. Id. ¶ 228; see Rel.

---

been reimbursed historically" for them. Id.; Rel. Resp. Def. SMF, Ex. 25 [Doc. No. 191-25] (email between Medtronic employees regarding Bend Memorial Clinic's response to pump training reimbursement pushback).

[13] Medicare covers the costs only if the self-management training is provided by a program that had been accredited by the American Association of Diabetes Educators or the American Diabetes Association. Def. SMF ¶ 61 [Doc. No. 177].

Resp. Def. SMF, Ex. 250 [Doc. No. 195-50] (listing individual training payments for Trainers employed by Bend Memorial Clinic, Medford Medical Clinic, and the Institute of Diabetes).

          3.   iPro Clinics[14]

              a.   Demonstration Clinics

During the relevant period from 2008 to 2014, Medtronic sales personnel ("Territory Managers" or "sales representatives") and/or Medtronic Managers (collectively, field personnel) promoted Medtronic products, including the iPro, through "iPro clinics." Def. SMF ¶ 80 [Doc. No. 177]; Rel. SMF ¶ 1 [Doc. No. 189]. These iPro clinics also could be conducted by a provider and his or her staff. Rel. Resp. Def. SMF ¶¶ 82, 97 [Doc. No. 189]. iPro clinics conducted by Medtronic field personnel were commonly referred to as "demos," "demo clinics," "demonstration clinics," and also, somewhat confusingly, "iPro clinics." Id. ¶¶ 82, 151. Medtronic field personnel conducted iPro clinics to demonstrate and promote the iPro device to providers in hopes that the physicians to whom they were showing the product would purchase the device for their own clinic's use or else increase their use of the iPros they already owned. Id. ¶¶ 83-84. These demonstration clinics were free of charge to the physician's office and the patients who participated. Def. SMF, Ex. 34A, MDT-WIT0000937 [Doc. No. 177-34].

Medtronic trained its sales representatives to promote the iPro using a five-step process culminating in the creation of "self sustaining [continuous glucose monitoring service] office protocols." Rel. Resp. Def. SMF ¶ 93 [Doc. No. 189]. Although Medtronic contends that establishing a self-sustaining office included identifying and training employees of the health care provider, referred to as "Office Champions" and "iPro Specialists," who would be

---

[14] The facts recited in this Section III.A.3 are relevant to each of Relator's theories of remuneration.

responsible for running iPro clinics in their respective offices, Def. SMF ¶ 97 [Doc. No. 177], there is evidence in the record to support Witkin's claim that designated Medtronic field personnel (Medtronic Managers or sales representatives) were instructed to "work with [the] office to identify and schedule 4-6 patients for the clinic," "come[] into the office on [the] scheduled day with Medtronic owned equipment," place and train the patient on the iPro, and follow-up to review the interpretation. Def. SMF, Ex. 34A, MDT-WIT0000937 [Doc. No. 177-34]; see Rel. Resp. Def. SMF ¶ 95 [Doc. No. 189]. In five-step programs, Medtronic also expressed to its sales representatives that Step 3 (demonstration clinics) should lead to Step 4— selling Medtronic products. Def. SMF, Ex. 34A, MDT-WIT0000928 [Doc. No. 177-34][15]; see also Rel. Resp. Def. SMF, Ex. 7 [Doc. No. 191-7] (email to both sales representatives and Medtronic Managers stating: "Who else but Medtronic can call on a physician's office, offer pump therapy and CGMS [iPro] and show an office how they can make money?" . . . . "The DCM [Medtronic Manager] in the Office Initiative will lead to additional CGMS clinics, which in turn identifies additional pump candidates. . . .").

Medtronic's written instructions to its sales representatives provided that Medtronic-run iPro clinics should not continue in the same physician's office on a regular basis. Rel. Resp. Def. SMF ¶ 88 [Doc. No. 189] (citing sales training presentation documents). And Medtronic's

---

[15] Witkin contends that Medtronic also trained its sales representatives to insert the iPro's subcutaneous needle into a patient's skin themselves, Rel. Resp. Def. SMF ¶ 77 [Doc. No. 189], relying on two exhibits that state that sales representatives should be able to demonstrate "good insertion techniques" and be able to "properly perform/guide sensor insertion," id., Exs. 48, 49 [Doc. Nos. 191-48, 191-49]. While this evidence shows that sales representatives who were in doctors' offices to pitch the use of the iPro were required to know how the iPro worked and be able to demonstrate how iPros are inserted, they do not support a conclusion that the sales representatives were actually performing procedures on patients. The parties do not dispute, however, that Medtronic Managers (as opposed to sales representatives) were able to, and did, perform such procedures.

general guidance to its representatives was to try to close a sale in two to five demo clinics. Id. ¶ 89. However, the company did not communicate or enforce a firm cap on the number of Medtronic-run demo clinics an employee could conduct. Id. ¶¶ 87, 89 (demo clinics could continue "to the extent a physician or physician office needs them to learn about the products"). Relator has also presented evidence showing that to address a "stagnant" account in one physician's office, a Medtronic sales representative and the Medtronic Manager with whom he partnered reported "implement[ing] weekly iPro clinics coupled with a 'TM in the clinic day.'" Rel. Resp. Def. SMF, Ex. 72 [Doc. No. 192-22]. The same document emphasized that the "TM in the clinic day" allowed the sales representative to "'find his fit' and expand further in the clinic," resulting in an 850% growth in Medtronic pump prescriptions in that previously stagnant physician's office. Id.

b.   Provider-run Clinics

iPro clinics that were conducted by providers, rather than Medtronic, were also referred to as "iPro clinics." Rel. Resp. Def. SMF ¶ 92 [Doc. No. 189]. From 2008 to 2014, Medtronic sales representatives and Managers also attended iPro clinics—not demonstration clinics—run by providers. Id. ¶ 99. These Medtronic employees would offer technical assistance, support the practice's use of iPro, and promote some of Medtronic's other relevant products, such as its insulin pump. Id. ¶ 92. Indeed, iPro clinics were designed, at least in part, to help both

prescribers and Medtronic identify potential pump candidates.[16] Id. ¶ 145 [Doc. No. 189]; see Rel. Resp. Def. SMF, Ex. 80 [Doc. No. 192-30].[17]

### 4. Medtronic Sales Strategies and Structures[18]

#### a. Commission Structure

Medtronic paid its sales representatives commissions based on meeting sales targets for different products. Def. Resp. Rel. SMF ¶¶ 41-42 [Doc. No. 206]. Sales personnel were provided individual Annual Operating Plans, which set the targets for their sales and impacted their compensation for that year. Id. ¶ 43. Beginning in 2009, commission bonuses could be accelerated based on pump sales to patients new to pump therapy. Id. ¶ 44. The Compliance Department had no role in setting these targets. Id. ¶ 47. In addition, Medtronic's upper management also received additional compensation when their teams performed well. Id. ¶ 48.

#### b. Leveraging the Use of Trainers

Medtronic often solicited competitors' contracts from the Trainers it paid and made business decisions based on resource allocation. Id. ¶¶ 221-22. Medtronic also knew that its

---

[16] Witkin disputes this, claiming that Medtronic viewed the iPro as a way to induce providers to refer patients to Medtronic's products. Rel. Resp. Def. SMF ¶ 145 [Doc. No. 189]. Witkin's affidavits to support this point are inadmissible because they rely on the truth of hearsay statements from other Medtronic sales representatives and/or doctors, or otherwise lack foundation as to how the affiant had knowledge of the conduct and motives of those people, see Rel. Resp. Def. SMF, Exs. 114 [Doc. No. 193-14] (Danahy Affidavit, Territory Manager in Maine, New Hampshire, Massachusetts, Vermont, Rhode Island, and Connecticut), 115 [Doc. No. 193-15] (Eman Affidavit, Territory Manager in Michigan), 117 [Doc. No. 193-17] (Eman Affidavit), 119 [Doc. No. 193-19] (Collaco Affidavit, Territory Manager in New York and Connecticut), 156 [Doc. No. 194-6] (Affrica Affidavit, Territory Manager in Michigan), and 203 (Collaco Affidavit) [Doc. No. 195-3]. The court will therefore not consider these affidavits.

[17] Exhibit 80 is a chart stating, among other things, the "Plan of Action" for Dr. Berelowitz's office as: "DCM [Medtronic Manager] in office on Mondays. TM in the office on Fridays. Get commitment for 4 patients a month. *Be present during all iPro clinics*." (emphasis added).

[18] The facts recited in this Section III.A.4 are relevant to Relator's second two theories of remuneration: that the iPro clinics were themselves remuneration, and that Medtronic offered other benefits and services (e.g., free staff) to physicians.

ability to "modify/increase [Trainer]/Center Contract Budget to compete with the competition" was one of Medtronic's most powerful resources. Id. ¶ 224.

Medtronic instructed its sales personnel to use Trainer payments and Center Contracts as financial leverage for increasing pump referrals. Id. ¶ 233. Medtronic was also responsive to Trainers who would threaten to switch their pump provider if Medtronic did not provide competitive reimbursement for the associated training. See supra n. 12. For example, in response to a potential change in pump training reimbursement rates, Tonya Koopman, a Trainer at Bend Memorial Clinic, emailed to tell Medtronic that implementing that reduced rate "would definitely lead us to seriously consider choosing other insulin pumps for our patient population." Rel. Resp. Def. SMF, Ex. 26, MDT-WIT0074153 [Doc. No. 191-26]. Medtronic responded that it would "honor how things have been reimbursed historically . . . ." Id. at MDT-WIT0074152. Medtronic worked to keep and gain business both to increase referrals of its pumps, but also to lock out the competition and build an "invisible fence" around a practice. Def. Resp. Rel. SMF ¶ 265 [Doc. No. 206]; see Rel. Resp. Def. SMF, Ex. 192 [Doc. No. 194-42].

c.   Medtronic iPro Sales Strategies

Medtronic trained its sales force to market the iPro as an easy money-maker for physicians. Def. Resp. Rel. SMF ¶¶ 99, 116 [Doc. No. 206]. First, Medtronic encouraged its personnel to be present in providers' offices to promote Medtronic products. Id. ¶¶ 66-74; Rel. Resp. Def. SMF Ex. 85 [Doc. No. 192-35] (describing a successful marketing technique where the sales rep stated: "We are the resource for [the doctor] that makes iPro scalable in your office. We can be an extension of you and your staff to truly realize this opportunity."); Rel. Resp. Def. SMF, Ex. 151 [Doc. No. 194-1] (In-Office Service Offerings-Best Practices Guide stating that by "scheduling regular hours in these offices," "the practice won't be burdened with the on the spot

training, button pushing, questions, etc."). Medtronic also implemented "DCM [Medtronic Manager] in the Office" days, which the company leveraged in conjunction with its iPro clinics. Id., Exs. 6, 7 [Doc. Nos. 191-6, 191-7]. In their internal communications, Medtronic sales representatives discussed how "something so simple as an iPro [could] generate so much business" and noted that their in-office "Presence=Presents (NPT [new pump therapy])." Def. Resp. Rel. SMF ¶ 69 [Doc. No. 206].

Second, Medtronic directed its sales force to emphasize "the available Medtronic support" and "attractive reimbursement" that came with the iPro when discussing the device with physicians. Id. ¶ 102; Rel. Resp. Def. SMF, Ex. 222 [Doc. No. 195-22] ("Agenda to Communicate to [Physician]" included that "Medtronic CAN help . . . [d]o MORE iPro's to increase revenue to practice"). Medtronic modeled these "attractive reimbursement" opportunities related to the iPro and Medtronic's pump therapy by walking providers through what it called the "CGM Continuum." Def. Resp. Rel. SMF ¶ 113 [Doc. No. 206]. The CGM (continuous glucose monitoring) Continuum illustrated that for every patient put on the iPro who transitioned to a Medtronic insulin pump, a provider could receive an average reimbursement from Medicare of about $520. Id. ¶ 114. It showed that for iPro-related procedures alone, the provider could receive up to $287 per Medicare patient. Id. ¶ 115. The return on investment related to the iPro was sometimes high enough that a practice could add another full-time employee. Id. ¶ 120.[19]

---

[19] To further emphasize the value of recurring iPro clinics, Medtronic created an "Economic Model" that illustrated a provider's revenue opportunity using factors like the provider's own patient population and government payor mix. Def. Resp. Rel. SMF ¶ 104 [Doc. No. 206]. These models illustrated a provider's potential revenue for the continuous glucose monitor-specific Medicare billing codes 95250 and 95251 and other codes that could be billed for follow-up. Id. ¶¶ 105, 111.

Third, Medtronic directed its sales force to emphasize the added value of Medtronic in-office personnel. For example, in an internal email setting out an agenda for a meeting between Medtronic sales representatives and a physician, the Territory Manager emphasized that while the physician's office "can be familiar with i[P]ro," having physician's office medical assistants ("MA"s) conduct clinics "is a waste of their time when we [Medtronic personnel] are willing to come in and perform this procedure for free." Rel. Resp. Def. SMF, Ex. 159 [Doc. No. 194-9] (email from Territory Manager Brittany Nemeth re: Dr. Q Discussion Strawman). Similarly, the email emphasized the economic benefit of Medtronic's pump training services, stating that "[e]ducators are paid out of pocket so their time is [the physician's] money. Many of the education pieces we can do for you for free." Id.; e.g., Rel. Resp. Def. SMF, Ex. 88 [Doc. No. 192-38] (Medtronic email to sales representatives claiming that "the net reimbursement [for iPro] is better than any [Evaluation and Management] code they bill and yet iPro can be done by an MA [medical assistant] or even better, we can assist the clinic!").

Moreover, Medtronic's field personnel regularly circulated and reported the successes that resulted from these practices with the intention that they be replicated throughout the territory, and some of these stories were distributed nationally to be used as a model for all of Medtronic's sales force. Def. Resp. Rel. SMF ¶¶ 82-83 [Doc. No. 206]. Sales representatives were rewarded for the volume of patients that providers in their area referred to pump therapy or to continuous glucose monitoring. Id. ¶¶ 90-92. They were encouraged to "add value" to the offices with which they worked and provided support. Id. ¶¶ 179, 181.

### d.   Involvement in Identifying Patient Candidates for Diabetes Products

Medtronic also encouraged its sales representatives to gain access to a provider's electronic medical records to identify which patients were good candidates for insulin pumps and iPro procedures. Id. ¶ 182.

18

In June 2013, Jesse Gilbert, a Senior Territory Manager, wrote to his supervisor that he had received a list of insulin-taking patients directly from a physician (Dr. Adolph), and that Gilbert "been given the green light to call [patients] and schedule for iPros." Rel. Resp. Def. SMF, Ex. 50 [Doc. No. 191-50]. Because of that patient access, Gilbert informed his supervisor that he was "set to run an iPro clinic every Thursday w[h]ere Medtronic would do insertion of iPros" and "pre-qualify patients for pump therapy" in a provider's office. Id.; Def. Resp. Rel. SMF ¶ 76 [Doc. No. 206]. Gilbert was commended for this practice by his supervisor, who shared the story with the rest of the sales team. Def. Resp. Rel. SMF ¶ 77 [Doc. No. 206]; Rel. Resp. Def. SMF, Ex. 50 [Doc. No. 191-50] (email from supervisor Nathan Chan stating that Gilbert and his partner "messag[ed] how they could assist the office by calling patients to schedule the patients for iPro (can you say NPT?) where they can discuss the integrated system during iPro hookup. Simply put, fantastic!").

In September 2013, another representative, Brittany Nemeth, described how she "was able to obtain . . . growth through weekly TM in the clinic/iPro clinic day once a week" during which she "used this time to identify appropriate pump/CGM candidates" that ultimately "eliminate[d] all pump competition" and made the provider "commit to only prescribing Medtronic pumps!" Def. Resp. Rel. SMF ¶ 80 [Doc. No. 206]. The office manager then provided the Medtronic clinical manager and the sales representative "a room that she said could be used by us and even wanted us to decorate it with Medtronic marketing materials." Rel. Resp. Def. SMF, Ex. 150 [Doc. No. 193-50]. Nemeth also told her supervisor that the office manager "was VERY excited about the idea that I could do [the iPro] for them and wants to be there when I discuss purchasing and reimbursement opportunity with iPro2." Id.

In November 2013, Territory Manager Jake Nielsen reported that they had "finally started to see the result of the consistent and persistent effort in Dr. Wilson's office" and that he had been in Dr. Wilson's office "every Tuesday and Thursday all day since . . . September." Def. Resp. Rel. SMF ¶ 61 [Doc. No. 206].[20] Noting that he had "implemented an iPro program with a huge financial hook for [Dr. Wilson's] wife" and that he was "pulling actual reimbursement of better than $250 per ipro [sic] study after sensor costs," Nielsen also wrote that he "go[es] through [Dr. Wilson's] scheduled patients each morning." Id.

Territory Manager Nielsen was nominated in 2014 to present his success story at Medtronic's national "Launch Acceleration Meeting." Id. ¶ 62. Nielsen knew he "need[ed] to find a way to expand business with Dr. Bruce Wilson to win" and that Dr. Wilson "has always been very pro Medtronic because of our local support." Id. By being in Dr. Wilson's office twice per week, on one day seeing patients that needed pump demonstrations and on the other day doing an iPro clinic, he was able to provide support to the practice. Id. Nielsen's District Manager, Nathan Chan, highlighted how Nielsen's services to Dr. Wilson removed competitors from the office and resulted in Dr. Wilson being "100% Medtronic." Id. ¶ 63.

a. Post-Sales Activity

After a physician's practice purchased an iPro unit, a Medtronic representative should still be "in the account to answer questions, provide some guidance, but be hands off and not substantively involved in those iPro clinics." Id. ¶ 161. Thus, it was "typical" for a sales representative to "answer questions, give additional guidance for those first few times that an account is on their own, so to speak, performing the iPro evaluation themselves" after the

---

[20] Although Medtronic has not offered contrary facts, the court treats the facts related to Dr. Wilson's practice as disputed given the limitations on discovery imposed by the court's Phase One Discovery order.

account had purchased the iPro. Id. ¶ 165. For the account to bill, "Medtronic diabetes reps ha[d] to be for the most part completely hands off; i.e., the account must own the product and they must perform the service." Id. ¶ 166. There are two instances in the record[21] where Medtronic employees were disciplined for providing more than three to five demo clinics. Id. ¶ 168.

Medtronic knew its providers' patients included beneficiaries of government healthcare programs, and Medtronic tracked that information nationwide. Id. ¶ 292. For example, Medtronic notified its sales team in 2008 that most practices are "between 25-40% Medicare." Id. ¶ 294. Medtronic also knew that if there was no reimbursement opportunity, there would be no purely financial incentive for providers to utilize the iPro. Id. ¶ 295. Medtronic sought to ensure that its providers would be reimbursed for the iPro services they provided. Id. ¶ 296. Medtronic kept track of how often Medicare and other payors were reimbursing providers for iPro procedures nationwide. Id. ¶ 301.

5.   Medtronic Involvement with Physician Billing Practices[22]

a.   iPro-related Billing and Reimbursement Codes

Medtronic instructed its sales representatives on three general categories of reimbursement codes related to the iPro: (1) Evaluation and Management ("E&M") Codes were used for the physician's face-to-face time with patients; (2) "G-Codes" were used by Clinical Diabetes Educators to bill time spent on patient education; and (3) Current Procedural Technology ("CPT") Codes were used by physicians to bill for procedures. Def. SMF, Ex. 34A, MDT-WIT000995 [Doc. No. 177-34]. Of these, two CPT codes were particularly relevant to the

---

[21] Counsel for Medtronic limited its 30(b)(6) designee from providing details beyond the scope of Phase One discovery about these instances. See Def. Resp. Rel. SMF ¶ 168 [Doc. No. 206].

[22] The facts recited in this Section III.A.5 are also relevant to Relator's second two theories of remuneration.

iPro devices and clinics.[23] First, CPT Code 95250 was the billing code for sensor placement, hook-up and calibration, patient training, sensor removal, and printout of recording. Def. SMF ¶ 109 [Doc. No. 177]; see Rel. Resp. Def. SMF, Ex. 63 [Doc. No. 192-13]. Second, CPT Code 95251 was the billing code for continuous glucose monitor data interpretation. Def. SMF ¶ 109 [Doc. No. 177]. Neither code was a brand-specific reimbursement code, meaning that neither was unique to Medtronic devices or trainings. Id. ¶ 108. Instead, the use of all professional continuous glucose monitoring devices from any manufacturer would be billed to these codes. Id. Medtronic's iPro presentation also instructed its sales representatives that "CPT codes on CGM [continuous glucose monitors] pay higher than most E&M codes." Def. SMF, Ex. 34A, MDT-WIT0000995 [Doc. No. 177-34].

Medtronic trained its field personnel (sales representatives and Medtronic Managers) to educate providers on reimbursement for iPro procedures. Rel. Resp. Def. SMF ¶ 95 [Doc. No. 189].  Specifically, Medtronic told its field personnel that "when an office owns the iPro and our involvement is incidental to the HCP's [healthcare provider's] staff involvement, the HCP's office staff is substantively involved, and our Representative is there to coach and provide instruction to the HCP's staff, the HCP's office can bill" to CPT billing code 95250. Id. ¶ 112. Medtronic directives also specified that the procedures covered by CPT billing code 95250 should "be performed by [an] RN, CDE [clinical diabetes educator] or MA [medical assistant]"—i.e., a medical professional, Def. SMF, Ex. 34A, MDT-WIT0000997 [Doc. No. 177-34], and that "iPro clinics must be managed by the HCP [healthcare provider] and staff—

---

[23] Providers could also bill for additional face-to-face evaluation and management based on how long the provider spent with a patient, and to more general diabetes education codes, which were broken down by individual or group sessions. Def. SMF, Ex. 34A, MDT-WIT0000996 [Doc. No. 177-34]. There were also CPT code "modifier[s]," which allowed providers to bill for the iPro work and other care provided on the same day. Id. at MDT-WIT0000998.

[Medtronic employees] may assist, but cannot do the work for them" in order for the HCPs to be reimbursed. Def. SMF, Ex. 67, MDT-WIT0014461 [Doc. No. 177-68].[24] Medtronic's materials about billing for iPro-related procedures identified Medicare claim form CMS Form 1500, which expressly required the physician to certify that the services were personally furnished or furnished under his or her direct supervision. Id. ¶ 114 (citing Def. SMF, Ex. 99 [Doc. No. 177-100]). This prohibition on billing for services not provided by a physician was reiterated in CMS guidance stating that healthcare providers could not bill "for services that [they] did not actually render," nor "for services performed by an improperly supervised or unqualified employee." Rel. Resp. Def. SMF ¶ 113 [Doc. No. 189] (citing Def. SMF, Ex. 68, at 5 [Doc. No. 177-69]).

---

[24] A Medtronic supervisor [Mike Gill] praised Medtronic representatives who were "completely entrenched" in doctors' offices. Def. Resp. Rel. SMF ¶ 28 [Doc. No. 206]; see Rel. Resp. Def. SMF, Ex. 116 [Doc. No. 193-16] ("A Message from Mike Gill"). Witkin takes Gill's statement one step further and contends that the very presence of Medtronic employees in physician offices *necessarily* resulted in physicians improperly billing for iPro clinics that were actually conducted by Medtronic employees. Def. Resp. Rel. SMF ¶¶ 19-23, 28, 31 [Doc. No. 206]. However, the admissible evidence Relator offers on this point does not support this inference. One email from Territory Manager Melissa Coleman breaks down her weekly schedule, including attending regular iPro clinics at several physician's offices. But the email does not state that Coleman was providing services outside of iPro product support by, e.g., treating patients or conducting the clinics herself. Rel. Resp. Def. SMF, Ex. 65 [Doc. No. 192-15]. A different email from Territory Manager Nathan Chan to a group of Medtronic sales representatives emphasized that Medtronic should "assist the clinic" in conducting iPros but does not specify how involved Medtronic personnel should or should not be. Id., Ex. 88 [Doc. No. 192-38] ("With regards to the [iPro] reimbursement, there is no greater endocrine procedure (other than thyroid biopsy that takes the MD to do and takes a considerable amount of time) that a MD can use to generate revenue. The net reimbursement is better than any E&M code they bill and yet iPro can be done by an MA or even better, we can assist the clinic!"). Additional Exhibits again refer to affidavits that contain inadmissible hearsay or otherwise lack proper foundation. See id., Ex. 114 [Doc. No. 193-14] (Danahy Affidavit); Ex. 115 [Doc. No. 193-15] (Eman Affidavit). The court notes, however, that this observation does not negate the force of Relator's evidence regarding Medronic's in-office field personnel providing free services *other* than iPro clinics to doctors.

Medtronic reported that Medicare paid out 8,978 claims for CPT code 95250 in 2009 and 17,276 claims in 2010, and paid out 8,062 claims for CPT code 95251 in 2009 and 15,816 in 2010. Id. ¶ 302.

b.   Physician Billing Practices

Witkin asserts that despite Medtronic's official policies on billing and iPro clinic demonstrations, physicians were nonetheless submitting improper claims under the iPro and insulin pump-related CPT codes in offices where Medtronic sales representatives and Medtronic Managers were frequently present, either during prescheduled "DCM in the Office" or "TM in the Office" days, or during iPro clinics purportedly run by the physician's office alone.

i.   Drs. Bertheau, Mallov, and Chaplin

While Medtronic was running weekly iPro clinics at Oregon-based Adventist Diabetes Center ("Adventist"), the physicians there submitted hundreds of claims for CPT Codes 95250-95251 and E&M Codes 99212-99215, which were codes providers could use to bill for iPro clinics and follow-up visits after iPro clinics. Def. Resp. Rel. SMF ¶¶ 305-306 [Doc. No. 206]. In August 2008, Territory Manager Kendall Cook sold several iPro devices to Dr. Leonard Bertheau at Adventist and pitched the idea of setting up a contract for Adventist to provide pump training. Id. ¶ 307. Later that month, Cook sent Dr. Bertheau an economic model that estimated a reimbursement amount of $238 per Medicare patient. Id. ¶ 309. Medtronic designated Cheryl Ortner as the Trainer who would train Adventist's patients to use Medtronic pumps and sent her an economic model that illustrated her potential income from pump trainings. Id. ¶¶ 310-11. In October 2008, Medtronic and Adventist executed this contract. Id. ¶ 312.

Between 2008 and 2009, Dr. Bertheau billed Medicare for 15 iPro procedures and 5 iPro interpretations. Id. ¶ 313. During this time, Dr. Bertheau and his Nurse Practitioner also

24

prescribed 38 insulin pumps. Id. ¶ 314. Between 2010 and 2012, Dr. Bertheau, Dr. Mallov, and

Dr. Chapin collectively submitted to Medicare: 64 claims for iPro procedures, 57 claims for iPro

report interpretations, and hundreds more claims for the E&M code that was outlined in

Medtronic's Economic Model. Id. ¶ 328.

By 2013, Cook was "putting patients in the system (from iPro clinics) prior to HCPs

[healthcare providers] approval" and "[a]s a result, the HCPs at . . . Adventist stopped providing

him with access to their patients." Id. ¶ 330. Cook resigned,[25] and other Medtronic sales

representatives continued to work with Adventist. Id. ¶¶ 330, 334. Between 2013 and 2014,

Amber Stifter was involved with iPro clinics at Adventist. Id. During this time, Drs. Bertheau,

Mallov, and Chapin collectively submitted 33 claims for iPro procedures, 24 claims for iPro

report interpretations, and hundreds more claims for the E&M code. Id. ¶ 336.

ii.    Dr. Berelowitz

Dr. Brian Berelowitz, whose clinic was located in Las Vegas, used CPT codes 95250 and

95251 more often than most of the other providers. Id. ¶ 337. Throughout the relevant timeframe,

he billed more than 600 iPro procedures, nearly 400 iPro interpretations, and thousands of office

visits using the E&M codes. Id. Dr. Berelowitz also prescribed Medtronic pumps that were paid

for by Medicare. Id. ¶ 338. Medtronic also continued to require Medtronic Manager's

"[m]andatory attendance at every iPro clinic every Thursday and Friday" in Dr. Berelowitz's

office, id. ¶ 340; see Rel. Resp. Def. SMF, Ex. 171 at 2 [Doc. No. 194-21]; see also id., Ex.

170 [Doc. No. 194-20],[26] despite Medtronic now asserting Dr. Berelowitz was "particularly self-

---

[25] Witkin raises Cook's sales practices and relationship with the company as a comparator in
connection with Witkins' retaliation claim, which the court will address in a separate order.

[26] Exhibit 170 is a document titled "Brian Berelowitz: Best Practices for iPro." Step 11 of the
document states: "Involve the DCM [Medtronic Manager] in every step. Much of the iPro

sufficient" (suggesting that his practice did not require product support staff to be on-hand

regularly). See Def. Resp. Rel. SMF ¶ 339 [Doc. No. 206]. As a result of Medtronic's presence

in his office, Dr. Berelowitz referred more of his patients to Medtronic's products. Id. ¶ 343; see

Rel. Resp. Def. SMF, Ex. 75 [Doc. No. 192-25] ("We have solidified how to use our i[P]ro

clinics to lead to immediate NPTs.").

### iii.    Dr. Krishnamurthy

Dr. Priya Krishnamurthy billed code 95250 to government payors several times before

she purchased her own iPro in late 2010/early 2011. Def. Resp. Rel. SMF ¶ 346 [Doc. No. 206];

see Rel. Resp. Def. SMF Ex. 320 [Doc. No. 196-70] (email between Dr. Krishnamurthy and

Adam Witkin discussing purchasing). Even after Dr. Krishnamurthy purchased her own iPro

devices, Medtronic staff were responsible for conducting her practice's iPro hook-ups: In an

April 2012 email exchange between a Medtronic Territory Manager and a Medtronic Diabetes

Clinical Manager, the Territory Manager stated that because of Dr. Krishnamurthy's low pump

referral rates, "we are done with the iPro charity we've provided for them. I will take the two

[iPro] units they purchased *back to them* and let them know we cannot continue to provide this

service for free anymore." Rel. SMF, Ex. 135 [Doc. No. 208-3 *SEALED*][27] (emphasis added).

In 2013, after Medtronic assigned Dr. Krishnamurthy's practice to a new Territory Manager's

district, Dr. Krishnamurthy apparently renewed her interest in having Medtronic staff "run [her

iPro clinic] and partner with her," Rel. Resp. Def. SMF, Ex. 324 [Doc. No. 196-74] (email from

Nathan Chan to Barbara Patterson), and Dr. Krishnamurthy's claims for iPro procedures and

---

evaluation training can and will be done by the DCM. Use their expertise to instruct the office
staff and MD on the right way to interpret and implement changes into practice." Id.

[27] The court is using shorthand and abbreviations for sealed material where possible to avoid the
need to seal portions of this Order.

report interpretations increased. Def. Resp. Rel. SMF ¶ 349 [Doc. No. 206]; Rel. Resp. Def. SMF, Ex. 326 [Doc. No. 196-76].

iv.    Other Physicians

In addition, there were insulin pump claim submissions resulting from the referrals of Dr. Bailey at the Providence Medical Group; Dr. Bassett at Willamette Valley Endocrinology; Drs. Garrison, Chamberlin, and Radhakrishnan at the Physicians Building Group (where Dr. Krishnamurthy also worked); Dr. Cirullo at Cascade Health Solutions; Dr. Curosh at Providence Portland; Dr. Decker at the Vancouver Clinic; Dr. Gallen at Black Oak Clinic (Medford Diabetes); Drs. Eddy and Kelly at the Institute of Diabetes and Endocrinology; Dr. Gallant at Corvallis Internal Medicine; Dr. Habas in Cherokee, NC; Dr. Hungerford at Southern Oregon Internal Medicine; Dr. Jacobson at Oak Street Medical; Dr. Mendoza at the Venata Wellness Center; Dr. Michaels at Firehouse Diabetes; and Dr. Theen at Dr. Theen Clinic—all of whom were identified by Witkin as providers who had received free services (e.g., free labor in the form of Medtronic sales representatives and Medtronic Managers being continuously and consistently present in the physician's office) and other inducements from Medtronic in exchange for recommending or referring patients to Medtronic's products. Def. Resp. Rel. SMF ¶ 351 [Doc. No. 206].

6.  Compliance Training and Monitoring

All Medtronic employees completed mandatory annual compliance training, which covered the AKS and Stark Law. Rel. Resp. Def. SMF ¶ 135 [Doc. No. 189]. Medtronic asserts that by 2009 all employees certified annually that they received such training. Id. ¶¶ 136-37.

27

Witkin also certified that he had completed mandatory ethics, compliance, and AdvaMed[28] trainings in 2009 and 2010. Id. ¶ 138. In addition, Medtronic provided personnel with updated Business Conduct Standards guidance and training, which covered topics including the AKS and Stark Law, pump training contracts, meal limits, gifts, and patient insertions. Id. ¶ 139. Specifically, Medtronic personnel were instructed that they "may not provide services that should be performed by [the physician's] own staff/employees" and that they "cannot provide anything of value in return for product orders, recommendations, referrals, leads, etc." Id. ¶ 140; see Def. SMF, Ex. 88, MDT-WIT0001527 [Doc. No. 177-89]; Def. SMF, Ex. 65, MDT-WIT0124040, MDT-WIT0124073 [Doc. No. 177-66]. Moreover, Medtronic personnel were instructed that they "should not do work or provide services that the doctor's office should be doing such as [a] routine doctor visit [or] evaluating or managing the patient's diabetes therapy." Rel. Resp. Def. SMF ¶ 140 [Doc. No. 189].

Medtronic monitored employee compliance with AKS and the Stark Law through self-reporting, contract review, a complaint tracking system (called EthicsPoint), and expense review. Def. Resp. Rel. SMF ¶¶ 143-51 [Doc. No. 206]. Managers also conducted field rides as a proactive way to audit the propriety of sales personnel's interactions with healthcare providers. Id. ¶ 152. Medtronic's Compliance Department was involved in setting the number of times a sales representative should demonstrate the use of an iPro prior to the healthcare provider deciding to purchase the product. Id. ¶ 155. However, it was not until 2014 (the end of the time period at issue here) that Medtronic implemented a method through which the Compliance

---

[28] The AdvaMed Code is "a set of guidelines that helps medical technology companies avoid using fraudulent practices in sales and marketing." Def. SMF, Ex. 60 [Doc. No. 177-61].

Department could track how many times someone performed an iPro clinic for the same doctor. Id. ¶ 157.

B.  *Discussion*

The False Claims Act, 31 U.S.C. §§ 3729-33, permits private citizens ("relators") to bring civil actions on behalf the United States to address fraud perpetrated against the federal government. The FCA imposes liability where a defendant "knowingly . . . causes to be presented a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The FCA scienter standard requires that the defendant either "ha[d] actual knowledge" of the claim's falsity, or else acted with "deliberate ignorance" or "reckless disregard" to the falsity of the claim." § 3729(b)(1). A relator may bring an FCA action against a non-submitting entity (e.g., a medical device company, rather than a physician) where "the entity directly submitting the claim to the government lacks the requisite mental state" so long as the non-submitting entity possessed the requisite scienter. Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019); see also United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 390 (1st Cir. 2011) ("[w]e have made clear that unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by an innocent party.").

The Anti-Kickback Statute serves to protect patients "from doctors whose medical judgments might be clouded by improper financial considerations." United States v. Patel, 778 F.3d 607, 612 (7th Cir. 2015); see United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 96 (3d Cir. 2018). To that end, the statute prohibits the knowing and willful offer or payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . to any person to induce such person" to "purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility,

service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Importantly, a kickback need not be successful to violate the AKS: The statute "does not require evidence of a 'quid pro quo' in the sense that each bribe must successfully generate referrals." United States v. Teva Pharms. USA, Inc., 2019 WL 1245656, at *10 (S.D.N.Y. Feb. 27, 2019). "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]" per se. 42 U.S.C. § 1320a-7b(g).

Similar to the AKS, the Stark Law generally prohibits an entity from causing a claim to be submitted by physicians and physicians for making a referral for the furnishing of health services, where the physicians have "compensation arrangement[s]" with such entity involving "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §§ 1395nn(a)(1)(B), (h)(1)(B). "Remuneration" is further defined by federal regulation as "any payment or other benefit." 42 C.F.R. § 411.351. Under the safe harbor provisions of the AKS and the Stark Law, however, certain types of "payment made by a principal to an agent as compensation" do not constitute remuneration so long as six preconditions are met. 42 C.F.R. § 1001.952(d) (AKS safe harbor); 42 C.F.R. § 411.357(d) (Stark Law safe harbor). These preconditions include, as relevant here, that:

> [1] The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms'-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health programs[,]

42 C.F.R. § 1001.952(d)(1)(iv); see 42 C.F.R. § 411.357(d)(1)(v) (same); and (2) "[t]he aggregate services contracted for do not exceed those which are reasonably necessary to

accomplish the commercially reasonable business purpose of the services." 42 C.F.R. § 1001.952(d)(1)(vi); see 42 C.F.R. § 411.357(d)(1)(iii) (same).[29]

As the Third Circuit concluded, "the Anti-Kickback Statute and the False Claims Act were not drafted to cabin healthcare providers' liability for certain types of false claims or for certain types of illegal kickbacks. Instead, Congress intended both statutes to reach a broad swath of 'fraud and abuse' in the federal healthcare system." Greenfield, 880 F.3d at 96. In that context, Greenfield held that "if a medical service provider pays kickbacks to a doctor to induce referrals and then submits claims to Medicare for services it provided to patients who were referred by that doctor, the claims are false" because the care was not provided in compliance with the Anti-Kickback Statute. Id. at 98 (citation omitted). Moreover, "[t]his outcome is the same regardless of whether the doctor would have referred the patients absent the kickbacks . . . and regardless of whether the patients would have chosen the service provider absent the referral." Id. (omission in original) (citation omitted).

As discussed above, the court permitted Witkin to proceed past the motion to dismiss stage on several specific theories of remuneration: (1) that Medtronic's pump training service payments to Trainers who were employed by physicians' offices or paid through center contracts with health care centers were unreasonably priced and structured; (2) that Medtronic sales representatives' and Managers' involvement in iPro clinics was so extensive it constituted a form of remuneration; and (3) that Medtronic offered other benefits to physicians, such as free office staff, supplies, meals, and trips. Where Witkin's evidence of free services is directly tied to his evidence related to iPro clinics, the court addresses (2) and (3) together.

---

[29] The parties disagree who bears the burden of proof regarding the safe harbor provision's applicability. The court need not resolve that issue in light of the disputed material facts.

1.   Pump Training Services

a.   Whether the Payments Constitute Remuneration

Witkin contends that Medtronic's payments to Trainers who were either hired through "center contracts" with physician's offices or were employed by physician's offices and paid directly by Medtronic for individual pump training sessions constituted remuneration.

The parties dispute whether Medtronic's pump training services were priced at fair market value or commercially reasonable. The court considers each argument in turn and, as set forth below, finds that Medtronic is not entitled to summary judgment based on the safe harbor provisions in light of disputed facts.

i.   Fair Market Value

Witkin argues that Medtronic paid excessive rates for its training services. Medtronic responds that its hourly reimbursement rate for training services was standard industry practice.

A service is priced at fair market value when "the price [is what] a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell." Klaczak v. Consol. Med. Transp., 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006).

Both parties proffer experts to support their position on whether Medtronic's pump training payments constituted a fair market value for pump training services.[30] Rel. Resp. Def. SMF, Ex. 19 (Report of Kathy McNamara) [Doc. No. 191-19]; Def. SMF, Ex. 12 (Report of Julie DeLong) [Doc. No. 177-12].

---

[30] The summary judgment record also contains declarations from Trainers regarding their experiences providing training services, email exchanges between Medtronic employees discussing competitors' rates for training services, documentation from Medtronic regarding actual payments made to the Trainers, Def. SMF Ex. 21 [Doc. No. 177-21 *SEALED*], and Medtronic training manuals describing the nature and average time period of certain training services. See Section III.A.2 (describing training types).

Given the influence of device referral volume on the market generally, McNamara declined to base her fair market value assessment on competitors' fee structures. McNamara Report at 44 [Doc. No. 191-19]. Instead, McNamara used an "expectation of payment" approach to ground her assessment of the pump training reimbursement rates' fair market value; in conducting her analysis, she used Medicare's recommended training frequency and reimbursement rate. Id. at 6-7, 44. Based on her experience and on Medtronic's own economic models, McNamara concluded that reimbursement rates ranging from equal to Medicare's reimbursement rates for diabetes management self-training to 150% of Medicare's reimbursement rate would be considered fair market value. Id. at 45-46. McNamara then compared Medtronic's payment rates from 2007 to 2013 and concluded that the rates exceeded the 150% Medicare rate cap for fair market value. Id. at 47 (summary table).

To the extent Medtronic now disputes McNamara's analysis on summary judgment on substantially the same grounds raised in its motion to strike—i.e., that she is not qualified as an expert on issues related to insulin pump training—those arguments are foreclosed here. To the extent Medtronic attempts to question McNamara's credibility generally and offers an expert who reaches a different conclusion, that is a determination for the trier of fact, not the court. "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Milward v. Acuity Specialty Prod. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert v. Merrell Dow. Pharm., Inc., 509 U.S. 579, 596 (1993)). Thus, because

resolution of this fair-market-value dispute would require the court to choose between the well-grounded opinions of competing experts, summary judgment is inappropriate on the issue.

> ii.    Commercial Reasonableness

Witkin also argues that Medtronic's payments to Trainers were not commercially reasonable because Medtronic failed to monitor the amount of time Trainers spent conducting training services, encouraged unnecessarily long training services, and permitted Trainers to conduct individual training sessions when group training sessions were more economical. Am. Compl. ¶¶ 191-198 [Doc. No. 74]. Medtronic responds that its pump training contracts were commercially reasonable in light of the training requirements imposed by Medicare, the company's need to ensure that its medical devices were being properly used, and comparable arrangements used by other device companies. Def. Mem. FCA/AKS 12-13, 15-16 [Doc. No. 176].[31]

A service is commercially reasonable when it is a "sensible, prudent business arrangement from the perspective of the particular parties involved, even in the absence of referrals." 69 Fed. Reg. 16054, 16093 (Mar. 26, 2004).

McNamara provided an opinion also on this issue. She again focused on Medicare's coverage guidelines, which included a preference for group training over individual diabetes self-management training, and a cap of ten hours of initial training, plus two hours of training each year as needed. McNamara Report at 34 [Doc. No. 191-19]. McNamara was concerned with

---

[31] Medtronic also objects that Witkin's Complaint did not allege that the pump training services were "commercially unreasonable," and that because of the late-breaking nature of Witkin's argument regarding commercial reasonableness, it was unable to prepare an expert witness on the issue. Def. Mem. FCA/AKS 11 [Doc. No. 176]. However, the facts undergirding Witkin's argument on this point appear in his Second Amended Complaint, even though he does not expressly reference the particular safe harbor subsection. See Am. Compl. ¶¶ 179-198 [Doc. No. 74].

Medtronic's failure to track the hours its Trainers worked, as the lack of data made it difficult to determine the actual payment rate as opposed to total payment amount, id. at 38-39, and with the fact that Trainers "rarely provided pump training in group settings," despite that format being "more economical for Medtronic" with "likely . . . similar outcomes." Id. at 39. McNamara also questioned the company's business strategy of outsourcing the training to physician's-office employed Trainers when Medtronic's own Managers often provided superior training services. Id. at 40. Finally, McNamara observed that certain "upgrade" trainings appeared unnecessary where the same service could be accomplished by webinar or phone call. Id. at 42. Taken together, McNamara concluded that Medtronic's strategy with respect to Trainer contracts did not make good business sense and was likely commercially unreasonable.

Again, the court has already denied Medtronic's motion to strike McNamara's testimony—including her testimony regarding commercial reasonableness. Even if the court were to exclude McNamara's testimony at the summary judgment stage, Witkin has put forth sufficient evidence that Trainers submitted bills for amounts above Medtronic's stated $50/hour payment rate, see Rel. Resp. Def. SMF, Ex. 33 [Doc. No. 191-33] (patient log signed by Trainer Tonya Koopman), that Medtronic adjusted its Trainer payment rate when clinics threatened to stop referring patients to Medtronic's products, see id., Ex. 26 [Doc. No. 191-26] (Bend Memorial Clinic email exchange), and that Medtronic continued to pay and contract with Trainers even when it would have been preferable to use a Medtronic Manager, see id., Ex. 37 [Doc. No. 191-37] ("Dr. Q made like training needed to be through her clinic or she wouldn't prescribe Medtronic."), demonstrating a genuine dispute of material fact as to whether Medtronic was paying fair market value (as discussed above) and whether Medtronic's arrangements with

outside Trainers were commercially reasonable. See, e.g., Rel. Resp. Def. SMF, Ex. 21 [Doc. No. 191-21].

> b.   Scienter

Medtronic also contends that Witkin has not demonstrated that Medtronic knowingly or willfully paid amounts above fair market value to its Trainers or knowingly and willfully engaged in commercially unreasonable payment plans with Trainers for the purpose of inducing referrals of its insulin pumps. Here, the court agrees with Medtronic. Medtronic has provided evidence that the company was concerned about its training budget and was attempting to reduce incurred costs in that space. Def. SMF, Ex. 104 [Doc. No. 177-106]. It has also provided evidence of the extensive information guides provided to Trainers, see id., Ex. 2 (Certified Product Trainer Manual) [Doc. No. 177-2], and of the importance placed on adequate training by the federal government, see Medtronic SMF ¶¶ 5 [Doc. No. 177] (citing government resources). Witkin does not meaningfully dispute these facts. See Rel. Resp. Def. SMF ¶¶ 4-5 [Doc. No. 189].

Rather, Witkin contends that Medtronic also viewed its training services as part of its arsenal of business development tools, and that Medtronic worked hard to cultivate its relationships with the Trainers and centers with whom it contracted. Rel. Opp. FCA/AKS 30 [Doc. No. 188]; Rel. Resp. Def. SMF ¶¶ 233-81 [Doc. No. 189]. But this evidence is insufficient to create a triable issue of fact as to Medtronic's scienter, particularly where Witkin's circumstantial evidence does not actually link Medtronic's promotion of its training services to Medtronic's pricing of those services. As a result, Witkin has failed to demonstrate that Medtronic possessed the requisite scienter with respect to its pump training service payments. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases

where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

2.   Medtronic-Provided iPro Services and Associated Free Services

a.   Remuneration

To start, Medtronic and Witkin disagree about the scope of iPro-related remunerative activities that survived the court's Order on Medtronic's Motion to Dismiss. For its part, Medtronic attempts to narrow the scope of the remuneration inquiry to focus only on Medtronic's advice and instructions to providers about billing practices. Def. Mem. FCA/AKS 22-23 [Doc. No. 176]. But as the court made clear, a provider "has received remuneration when he otherwise would have had to expend additional money or time to administer [] services himself or pa[id] staff to do so." Order 15 [Doc. No. 86]. Nothing in the court's Order suggests that the analysis at summary judgment should be limited exclusively to Medtronic's conduct with respect to billing advice.

The court may properly consider whether Medtronic provided substantial independent value to physicians via "engag[ing] in patient selection for iPro clinics, perform[ing] insertions of the iPro unit. . . , provid[ing] all necessary equipment, print[ing] results, interpret[ing] results and mak[ing] treatment recommendations." Rel. Opp. FCA/AKS 6 [Doc. No. 188]. In response, Medtronic asserts that "where Medtronic personnel were at 'Medtronic assisted' iPro clinics, they provided only product support services or promotion of Medtronic products"—not "substantial value independent of [those] product[s]." Def. Mem. FCA/AKS 25 [Doc. No. 176]. A reasonable jury could find otherwise.

First, the evidence suggests that Medtronic was doing more than simply "assisting" in iPro clinics. Witkin has provided emails from Medtronic sales representatives indicating that they were pitching themselves as "the resources for [physicians] that makes iPro scalable in [their] office," and that Medtronic representatives could be "an extension of [physicians] and [their] staff to truly realize this [iPro] opportunity." Rel. Resp. Def. SMF, Ex. 85 (email chain from Pacific Northwest District Manager titled "RE: iPro2 2 Success Story") [Doc. No. 192-35]. A different Medtronic sales representative described working with a doctor who already owned three iPros, but where Medtronic nevertheless "r[an] an iPro clinic every Thursday, w[h]ere Medtronic would do insertion of iPros"—while at the same time "prequalify[ing] patients for pump therapy." Rel. Resp. Def. SMF, Ex. 50 (email chain titled "Re: PLEASE READ: Tacoma Thunder Success") [Doc. No. 191-50]. In addition, Medtronic had "the green light to call and schedule" patients for iPro therapy in that office. Id. In a 2013 Austin North Territory Plan document, a Medtronic employee reported that one doctor "thinks he is giving an unfair advantage to MDT [Medtronic] by having them do iPro in the office and talk pumps." Rel. Resp. Def. SMF, Ex. 205 [Doc. No. 195-5]. The same document then stated that in response to these concerns, Medtronic should "[d]iscuss picking mdt [Medtronic] NOT bc of the relationships we have but bc it is the best therapy for him and for his pts." Id. The document did not suggest that Medtronic should reduce or otherwise alter its in-office presence in response to the physician's concerns. Taken together, this evidence is sufficient to show a genuine dispute of material fact as to whether Medtronic sales representatives' and Managers' conduct in running iPro clinics crossed the line from mere product support to effectively running the iPro clinics on behalf of the physicians.

Second, the evidence also suggests that Medtronic provided resources to physicians even beyond running gratuitous iPro clinics. See generally supra Section III.A.4(c)-(d). Medtronic's "In-Office Service Offerings-Best Practice" guide for the Las Vegas territory included a weekly four-hour session in which Medtronic employees were encouraged to provide iPro services, offer iPro report suggestions, and also provide any "[a]dditional services to be determined by [the physician] and staff" so that "the practice won't be burdened." Rel. Resp. Def. SMF, Ex. 151 [Doc. No. 194-1]. In a document explaining why "NPT Revenue" was up in one physician's office, Medtronic listed "[c]linic support from MDT [Medtronic]," including "provid[ing] staff 2+ days per week for pump downloads, document collection, iPro help, and general troubleshooting" as reasons for the success. Rel. Resp. Def. SMF, Ex. 147 [Doc. No. 193-47]. A 2014 email from a Medtronic sales representative entitled "Dr. Q Discussion Strawman" outlined a draft conversation with a physician which emphasized that having the physician's staff perform iPro "was a waste of their time when we are willing to come in and perform this procedure for free," and that "[e]ducators are paid out of your pocket so their time is your money. Many of the education pieces we can do for you for free." Rel. Resp. Def. SMF, Ex. 159 [Doc. No. 194-9]. In a meeting agenda with a different physician, a Medtronic representative emphasized that "Medtronic CAN help" by "interpret[ing] reports," "identifying type 2 MDI [multiple daily injection] patients who can benefit from an iPro & schedule [them]," and "[d]o MORE iPro's to increase revenue to practice." Rel. Resp. Def. SMF, Ex. 222 [Doc. No. 195-22].

Medtronic argues in the alternative that these activities are nothing more than "opportunit[ies] to bill," which do not constitute remuneration under the AKS or the Stark Law. Def. Reply 12 [Doc. No. 249]. That assertion is incorrect as a matter of law. "Giving a person an opportunity to earn money may well be an inducement to that person to channel potential

Medicare payments towards a particular recipient." United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 29 (1st Cir. 1989). In any event, the evidence shows that Medtronic was providing more than simply an opportunity to bill—it was providing a substantial, independent value to physician's offices in the form of additional in-office staff, repeated iPro clinics, data interpretation, and patient scheduling.

      b.   Causation and Burden of Proof

Medtronic further argues that, even assuming Witkin has demonstrated that its iPro-related activities were improper, Witkin has not demonstrated that they were the but-for cause of any improper claims submitted to the federal government. Def. Mem. FCA/AKS 27-28 [Doc. No. 176]. There are two issues with Medtronic's position. First and most importantly, Medtronic is incorrect that but-for causation is the appropriate standard where an FCA action is predicated on a violation of the AKS.

The AKS provides that any "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim" under the FCA; in other words, an AKS violation may serve as the predicate for an FCA violation. See 42 U.S.C. § 1320a-7b(g). Defendant contends that the use of "resulting from" limits the statute's applicability to the FCA only where an allegedly false claim would not have been submitted but-for the preceding AKS violation. Def. Reply 3 [Doc. No. 249]. Medtronic substantially relies on two out-of-circuit cases that interpret the FCA to require but-for causation: United States ex rel. Martin v. Hathaway, 63 F.4th 1043 (6th Cir. 2023), and United States ex rel. Cairns v. D.S. Med. LLC, 42 F.4th 828 (8th Cir. 2022). The Sixth and Eighth Circuits relied on the Supreme Court's statement in Burrage v. United States, 571 U.S. 204, 211 (2014), a case interpreting the Controlled Substances Act, 21 U.S.C. § 801 et seq., to conclude that "in the usual course," causation refers to an outcome that

"would not have occurred in the absence of—that is, but for"—the challenged conduct. Cairns, 42 F.4th at 834-835; see also Martin, 63 F.4th at 1052-53. In Burrage and elsewhere, however, the Supreme Court has expressly recognized the importance of context in ascribing meaning to statutory language. See 571 U.S. at 212 ("'results from' [should be read] to require but-for causality" where there is "no textual or contextual indication to the contrary").

The AKS does not contemplate causation in the "usual course": rather, the statute strongly indicates that but-for causation is *not* the appropriate standard. As discussed above, the AKS can impose criminal liability on entities who receive remuneration even where no referral is ever made. It would be counterintuitive for the statute to define illegal remuneration under an indirect causation standard in the criminal context (e.g., an AKS violation), but ascribe a more stringent causation standard in the civil context (e.g., an associated FCA violation). It would also run counter to Congress' expressly stated intent in adding Section 1320a-7b(g)—to "strengthen[] whistleblower actions"—to simultaneously increase the causation bar for bringing such action.[32]

Rather, "a *sufficient* causal connection between an AKS violation and a claim submitted to the federal government" is all that is required. Guilfoile, 913 F.3d at 190 (emphasis added) (citing Greenfield, 880 F.3d at 96-98).[33] A sufficiency standard of causation comports with Congress' intent and strengthens the protections against inducements to physicians that would

---

[32] The Government's proffered hypothetical on this point is instructive. Ascribing but-for causation to FCA liability resulting from an AKS violation would mean that a physician could accept cash bribes from a company but could avoid fault under the FCA if the physician claimed that he or she would have prescribed the company's product for other reasons too. Gov't Statement of Interest 8 n.2 [Doc. No. 250].

[33] This court echoes other decisions from this district, which have found that "the First Circuit's analysis [in Guilfoile] is persuasive, if not binding." United States v. Teva Pharms. USA, Inc., 2023 WL 4565105 *5 (D. Mass. July 14, 2023).

inherently cloud or improperly influence their medical judgments. This sufficiency standard of causation applies to both express and implied certification theories of falsity. See United States ex rel. Hutcheson, 647 F.3d at 392-94; Gov't Statement of Interest 9-10 [Doc. No. 250].

Second, Medtronic argues that the AKS requires the Relator to demonstrate that Medtronic possessed "intent to solicit a crime on the part of" the healthcare providers. Def. Reply 15 [Doc. No. 249].[34] Medtronic reaches this conclusion by relying on United States v. Hansen, 599 U.S. 762 (2023), to interpret the word "induce" within the meaning of the AKS. The AKS was not at issue in Hansen: That case was concerned only with 8 U.S.C. § 1324, a statute criminalizing bringing in and harboring certain non-citizens. Id. at 762, 776. In that specific statutory context, the Supreme Court held that "induce" should be given the meaning typically ascribed to the word in criminal facilitation and solicitation statutes. Id. at 776-77. But as the government correctly notes, "[n]othing in the text of the AKS suggests it is an aiding and abetting statute like the one at issue in Hansen, which applied only where the defendant s[ought] to 'induce' a thing that is independently unlawful." Gov't Statement of Interest 15 (internal quotation omitted) [Doc. No. 250]; see also Pharma. Coal. for Pat. Access v. United States, et al., 2024 WL 187707, at *8 (E.D. Va. Jan. 17, 2024) ("Hansen announced no categorical rule about either 'induce' or 'encourage' in criminal statutes or elsewhere: rather, 'the context of these words—the water in which they swim—indicate[d] that Congress used them as terms of art' in 8 U.S.C. § 1324(a)(1)(A)(iv)") (appeal pending).

---

[34] Along these lines, Medtronic also seems to contend that the valid actions of product promotion and customer support negate any potential misconduct associated with its iPro clinics. But "a lawful purpose will not legitimize a payment that also has an unlawful purpose." OIG Compliance Program Guidance, 60 Fed. Reg. 23731, 23734 (May 5, 2003).

The AKS, unlike the criminal statute at issue in <u>Hansen</u>, 8 U.S.C. § 1324(a)(1)(A)(iv), and common-law criminal solicitation, does not punish conduct that is independently illegal outside of the proscriptions contained within the AKS itself. Rather, the AKS penalizes "induce[ment]" where its particular consequences relate to the acquisition of services funded by federal healthcare programs. The distinct statutory purposes of the AKS and 8 U.S.C. § 1324(a)(1)(A)(iv) make it inappropriate to ascribe an identical interpretation to a critical word defining the criminal act at issue. Indeed, the Supreme Court has cautioned against "establishing categorical rules for those terms [the Court has previously interpreted]" where those rules "would accordingly 'abandon the care we have traditionally taken to construe . . . words in their particular statutory context.'" <u>United States ex rel.</u> <u>Schute v. SuperValu Inc.</u>, 598 U.S. 739, 754 (2023). This court therefore declines to extend the reasoning in <u>Hansen</u> to obfuscate the statutory purpose of the AKS.

Third, Medtronic improperly tasks Relator with disproving each and every one of Medtronic's alternative interpretations of the evidence at the summary judgment stage. For instance, Medtronic states that the fact that some providers billed to CPT codes 95250 or 95251 is irrelevant, because "there was more than one professional CGM [continuous glucose monitoring] device on the market" at the time. Def. Mem. FCA/AKS 28 [Doc. No. 176]. But Relator's job as the non-moving party at summary judgment is not to conclusively prove the inference (or inferences) that would validate his claim. Rather, he must proffer evidence that could support a reasonable jury's conclusion that the physician's billing practices were related to Medtronic's improper conduct vis-à-vis the iPro clinics.

This he has done. Witkin submitted evidence of CMS claims data from physicians who had Medtronic sales representatives and Managers extensively and repeatedly participate in iPro

clinics, and has provided temporal links between certain physicians' claims data to certain patients known to have attended iPro clinics. Rel. Post-Hrg. Mem. 15-19 [Doc. No. 221] (listing specific claims from Adventist Medical Center, Portland Diabetes and Endocrinology Center, Dr. Berelowitz, Dr. Krishnamurthy, Dr. Ravuri, and Dr. Stephens) (citing Exs. 328-330 [Doc. No. 224 *SEALED*] (Excel files showing insurance claims for patients); see also Rel. Resp. Def. SMF, Ex. 325 (Excel file of Relator Witkin's territory claims data) [Doc. No. 195-75 *SEALED*]. Medtronic does not dispute the validity of Relator's CMS data or the dates on which the relevant events occurred. Def. Resp. Post-Hrg. Mem. 15-17 [Doc. No. 226]. Instead, Medtronic contends that this is not sufficient evidence to survive summary judgment, because it shows only that "Medtronic representatives were present in doctors' offices during times in which the offices prescribed Medtronic insulin pumps." Id. at 14 [Doc. No. 226]. But that showing *is* enough: in arguing otherwise, Medtronic ignores that a reasonable jury could conclude that Medtronic's "in-office presence" provided an extraneous, free-of-charge service to the physicians that itself constituted remuneration, *even if* Medtronic personnel were not administering the iPro clinics themselves.

Witkin may rely on indirect evidence that Medtronic's presence resulted in physician billing, where "a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation," United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 189-90 (5th Cir. 2009), and "Medicare billing documentation . . . may serve as circumstantial evidence that a claim was submitted to Medicare," United States ex rel. El-Amin v. George Washington Univ., 522 F. Supp. 2d 135, 143 (D.D.C. 2007). Relatedly, Medtronic's attempts to discount Relator's evidence on the ground that no pumps were ever shipped to certain patients are unavailing. Def.

Resp. Post-Hrg. Mem. 15-17 [Doc. No. 226]. "A resulting sale is not an element of an AKS violation, nor is the kickback recipient's subjective belief that he or she has been influenced. The AKS may be violated even if no sale occurs." United States ex rel. Fesenmaier v. The Cameron-Ehlen Grp., Inc., 2021 WL 101193, at *12 (D. Minn. Jan. 12, 2021) (citing United States ex rel. Parikh v. Citizens Med. Ctr., 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results.")).

c.   Scienter

Relator has also provided sufficient evidence for a reasonable jury to find that Medtronic knowingly and willfully violated the AKS by having its sales representatives and Medtronic Managers continuously involved in iPro clinics, and by consistently staffing Medtronic personnel in physician's offices as a means of "adding value" to those physicians' practices, in order to induce physicians to prescribe Medtronic's insulin pumps in lieu of competitors' products. The evidence shows that Medtronic repeatedly touted its hyper-involvement in physicians' offices as a business-winning success strategy in internal communications between regional sales teams—despite the company's formal guidance cautioning against certain such behaviors. Medtronic's own policy stated that once a physician had purchased an iPro device, the company should cease running iPro clinics in that office. Rel. Def. SMF Ex. 34A, MDT-WIT0000992 [Doc. No. 177-34]. Nevertheless, Medtronic employees returned to offices that had purchased iPros to provide clinics on regularly scheduled bases. Rel. Resp. Def. SMF, Exs. 57-59 [Doc. Nos. 192-7–192-9]. Medtronic also required its employees to conduct training on the False Claims Act and on ethical sales behavior. Rel. Resp. Def. SMF ¶ 143 [Doc. No. 189]. These trainings expressly instructed that Medtronic personnel "should not do work or provide services that the doctor's office should

be doing such as [a] routine doctor visit [or] evaluating or managing the patient's diabetes therapy," id. ¶ 140, or otherwise provide services that the physician's office could provide. Id. Again, despite that stated policy, Relator has come forward with evidence that in practice Medtronic representatives assisted in iPro data interpretation, patient scheduling, free educational programs, and other value-adding tasks within clinical settings. This evidence is sufficient to create a genuine question regarding intent, and thus requires the denial of summary judgment.

## IV.   Conclusion

In summary, Relator's claim that Medtronic's payments to physicians for pump training services constituted the knowing and willful offer or payment of remuneration to physicians to induce them to purchase or recommend purchasing Medtronic devices fails for lack of scienter; however, Relator's allegations that false claims were being submitted to federal health care programs survives summary judgment where he has presented sufficient evidence that: (1) Medtronic sales representatives and Medtronic Managers were consistently involved in running iPro clinics long after those iPro clinics should have been conducted independently by physicians and their staff, and that physicians were therefore improperly billing for services not provided by their own offices, and (2) that Medtronic knowingly offered other benefits to physicians, particularly in the form of free office staff/support (e.g., "DCM in the Office" days), to induce physicians to prescribe Medtronic insulin pumps.

For the foregoing reasons, Medtronic's Motion for Summary Judgment as to Witkin's False Claims Act Claims [Doc. No. 175] is GRANTED in part and DENIED in part.

IT IS SO ORDERED

March 31, 2024                                      /s/      Indira Talwani
                                                   United States District Judge