UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. ADAM WITKIN, <br><br> Plaintiffs and Relator, <br> v. <br><br> MEDTRONIC, INC., and MEDTRONIC MINIMED, INC., <br><br> Defendants. | * <br> * <br> * <br> * <br> * Civil Action No. 1:11-cv-10790-IT <br> * <br> * <br> * <br> * <br> * |

MEMORANDUM & ORDER

April 10, 2024

TALWANI, D.J.

Plaintiff and Relator Adam Witkin brings claims against Medtronic, Inc., and Medtronic Minimed, Inc. (collectively, "Medtronic" or "Defendants") on behalf of the federal government and others (the *qui tam* claims) and on his own behalf (the retaliation claims). The court has addressed Medtronic's motion for summary judgment on the *qui tam* claims, see Memorandum and Order [Doc. No. 271], and now turns to Medtronic's motion for summary judgment on Witkin's remaining retaliation claims. For the reasons set forth herein, Medtronic's Motion [Doc. No. 172] is DENIED.

**I. Defendant's Motion for Summary Judgment of Witkin's Retaliation Claims**

    A. *Procedural Background as to the Retaliation Claim*

Witkin filed his operative Second Amended Complaint [Doc. No. 74] alleging retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count IV), discrimination for whistleblowing in violation of Or. Rev. Stat. § 659A.199 (Count V), and wrongful termination under both Oregon and California state common law (Count VI). Id. ¶¶ 634-53. The court denied

1

Medtronic's Motion to Dismiss [Doc. No. 76] these claims. Order on Motion to Dismiss 42-48 [Doc. No. 86].[1, 2]

    B.  *Factual Background*[3]

        1.  Witkin's Employment with Medtronic from 2004 through 2009

Witkin began his employment with Medtronic as a Diabetes Management Consultant (later referred to as a "Territory Manager") in 2004. Relator Response to Defendants' Statement of Undisputed Facts ("Rel. Resp. Def. SOF") ¶¶ 1-2 [Doc. No. 186]. Witkin received positive performance reviews in his first five years with Medtronic. Id. ¶ 8. In 2007, he was promoted to Senior Territory Manager, and he ranked seventh out of 190 territories for overall performance. Id. ¶ 9. In 2009, Witkin was rated as a "high contributor" and finished in the top 50% in the nation. Id. ¶ 13; Def. Statement of Undisputed Facts ("Def. SOF"), Ex. A at MDT-WIT0002896 [Doc. No. 174-1].

        2.  Witkin and Medtronic Resolve a Commission Payment Dispute (March 2010 through June 2010)

In March 2010, Medtronic discovered it had erroneously overpaid Witkin and a number of other employees based on a commission calculation error, and it asked Witkin to repay more than $20,000 in unearned commissions. Rel. Resp. Def. SOF ¶¶ 17-18 [Doc. No. 186]; Def. SOF, Ex. N (Repayment Agreement) [Doc. No. 174-14]. Witkin objected to the repayment

---

[1] The substance of the court's Order on the Motion to Dismiss [Doc. No. 86] makes clear that these are the remaining claims, although the numbering in the Order was incorrect. See id. at 48-49.

[2] Medtronic states that Witkin voluntarily dismissed Count VI (the California wrongful termination claim), Def. Mem. FCA/AKS 2 [Doc. No. 176] (citing [Doc. No. 103]), but his Voluntary Dismissal [Doc. No. 103] dismisses only Count III, which sought damages under California and Illinois insurance fraud statutes.

[3] The factual background related to Witkin's *qui tam* claims, including additional information on the conduct of Territory Manager Kendall Cook, is set forth in the court's Memorandum and Order addressing those claims. Mem. & Order [Doc. No. 271].

request in an email to Rosemary Hintz, Medtronic's Director of Human Resources, Rel. Resp. Def. SOF ¶ 20 [Doc. No. 186], a phone call with Hintz, id. ¶ 22, and a phone call with Celeste Ortiz, the Vice President of Human Resources for Witkin's group, id. ¶ 23; by June 23, 2010, Witkin had agreed only to repay the commission at a rate of $50 per month "under duress" because he believed he would otherwise "eventually be terminated." Id. ¶ 24. Although there is a dispute as to Witkin's statements and demeanor during these calls and a claim by Medtronic that Witkin was to be barred from the June 2010 National Sales Meeting,[4] at the time of the calls and in the months following, Medtronic did not take any disciplinary action (or even inform him of

---

[4] Hintz stated at her deposition that she found Witkin's behavior in connection with the overpayment issue to be "abrasive and disturbing," and "unprofessional," and that she informed Ortiz about her interactions with Witkin. Def. SOF, Ex. L at 89:15-90:4 (Hintz Tr.) [Doc. No. 174-12]. Ortiz stated that Witkin was very angry during her call with Witkin and that he made threatening statements leading Ortiz to contact Medtronic's external employee assistance plan leader. Def. SOF, Ex. P ¶¶ 13-15 (Ortiz Decl.) [Doc. No. 174-16]. Ortiz stated further that the leader suggested that she terminate Witkin's employment because of his behavior, and that she considered excusing Witkin from Medtronic's national sales meeting in June 2010. Id. ¶¶ 15-17. Witkin disputes Hintz and Ortiz's characterization of his demeanor and "unequivocally den[ies]" the assertion that he made threatening statements (though he does concede that he does not recall specifically his interactions with Ortiz). Rel. Resp. Def. SOF, Ex. 23 ¶ 2 (Witkin Aff.) [Doc. No. 186-23].

Medtronic moves to strike Witkin's Affidavit on the ground that it lacks reliable foundation, as he stated at his deposition that he did not recall details surrounding the "commission overpayment situation." Def. Resp. Rel. Counterstatement of Material Facts ("Def. Resp. Rel. SOF") ¶ 23 [Doc. No. 202]. But Witkin's denial of the conduct now charged is not necessarily inconsistent with not remembering the details of calls he conceded occurred, particularly if the calls were in his view uneventful; ultimately, the question as to what happened in those calls is a question of credibility that cannot be resolved on a motion for summary judgment. Ortiz's and Hintz's testimony regarding their recollection of the conversations (that the conversations seemed to these two employees to be "inappropriate" and "threatening") is ultimately immaterial at this stage, where there is nothing in the record to suggest that they took any action based on Witkin's demeanor or behavior until after Witkin was terminated in February 2011.

3

the possibility of any such action) relating to these calls or the commission dispute; to the contrary, Witkin thereafter attended the June 2010 National Sales Meeting. Id. ¶ 23.[5]

### 3. Witkin is Assigned a New Supervisor and Given New Annual Performance Goals (July 2010)

In mid-2010, Michael Ware became the District Manager supervising Witkin's territory. Id. ¶ 6. On July 15, 2010, Witkin asked the finance department to review his annual performance goals because they seemed too high. Id. ¶ 14. Witkin's concern was echoed by other sales representatives concerning their goals and Ware responded to another Territory Manager, Kendall Cook, that he agreed that Cook's goals seemed "really off." Id.; Rel. Resp. Def. SOF, Ex. 4 (email from K. Cook to M. Ware) [Doc. No. 186-4].

### 4. Witkin Is Instructed to Conduct More iPro Clinics

In September 2010, Ware accompanied Witkin on a "field ride" and discussed sales strategies and execution of sales. Id. ¶ 26.[6] Ware drafted a Field Coaching Report after the field ride that assigned Witkin extremely low performance ratings in "stark contrast" to Witkin's prior reviews. Def. Resp. Rel. SOF ¶ 28 [Doc. No. 202].[7]

---

[5] Other than moving to strike Witkin's Affidavit as lacking reliable foundation, Medtronic does not dispute the assertions regarding the lack of any discipline or that he attended the June 2010 National Sales Meeting. Def. Resp. Rel. SOF ¶ 23 [Doc. No. 202].

[6] Witkin's allegation that he expressed concern to Ware about kickbacks during this September 2010 field ride is not supported by any sworn testimony (such as his own affidavit or deposition transcript) and appears in the summary judgment record only as set forth in emails and letters he wrote months later. See id. ¶¶ 28, 65-68; id. ¶ 55 (citing Def. SOF, Ex. W (January 7, 2011 email to the FDA) [Doc. No. 174-23]); Def. SOF, Ex. H (email from Witkin to Ware) [Doc. No. 174-8]. Those communications are discussed below.

[7] Medtronic disputes Witkin's characterization of Witkin's prior performance reviews but does not point to any evidence in the record that would undermine that characterization; for purposes of summary judgment, the court accepts Witkin's firsthand observations of his own past performance reviews.

In his September Field Coaching Report, Ware indicated that Witkin was not conducting enough iPro clinics and that Witkin had "communicated to me that you did not have an iPro and Chris [Witkin's DCM partner] has all the iPros." Def. SOF, Ex. H at MDT-WIT0078768–70 (September Field Coaching Report) [Doc. No. 174-8]. In a follow-up email, Witkin wrote to Ware "confirm[ing] that I understand exactly how to implement your . . . strategy for ipro clinics"; namely that the "TM" or Territory Manager (the position he held) "does ipro clinic in the office every time office has ipro patients (we become part of the office on a weekly, or bi-weekly basis indefinitely)." Id. at MDT-WIT0078755 (email from Witkin to Ware). Witkin did not express any concern with that course of conduct in his email.

In October 2010, Ware accompanied Witkin on a second field ride. Witkin Aff. ¶ 4 [Doc. No. 186-23]. Ware told Witkin that he should access patient accounts to identify good candidates for Medtronic pumps. Id. It was Witkin's understanding that accessing a patient's medical records without the patient's permission was a HIPAA violation.[8] Id. The record is silent as to whether Witkin expressed this understanding to Ware.

In his October Field Coaching Report, Ware reported that Witkin claimed that he did not know that he was responsible for completing iPro clinics. Rel. Resp. Def. SOF, Ex. 7 at MDT-WIT0058078 (October Field Coaching Report) [Doc. No. 186-7]. Ware noted that "[t]his has been an initiative by Medtronic Diabetes for over 2 years." Id.

5.   Witkin's Overall Performance Ranking Declines After the Two Field Rides

In October 2010, Witkin was ranked 43 out of 185 Territory Managers. Rel. Resp. Def. SOF, Ex. 6 [Doc. No. 186-6]. Witkin's October 2010 Field Coaching Report also indicates that he was improving in multiple areas. Rel. Resp. Def. SOF ¶ 16 [Doc. No. 186]; Def. SOF, Ex. J

---

[8] HIPAA refers to the health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 et seq., a federal law concerning disclosure of patient health information.

(October Field Coaching Report) [Doc. No. 174-10]. However, despite these positive reviews, Witkin's year-to-date ranking in September 2010 was only 173 out of 187 Medtronic sales personnel in overall performance and for October 2010 was only 171 out of 188. Rel. Resp. Def. SOF ¶¶ 15-16 [Doc. No. 186].

On November 1, 2010, Witkin again objected that his sales quota was set unreasonably high, possibly because of "retaliation" for his response to the commission overpayment. Id. ¶ 31.

On November 2, 2010, Ware addressed Witkin's alleged performance issues, including Witkin's refusal to execute iPro clinics on his own in a "Letter of Concern." Id. ¶¶ 33-36. Ware also commented on Witkin's "lack of positive attitude," "condescending and sarcastic" statements to Ware, "lack of accountability," "and lack of commitment to excellence." Def. SOF, Ex. A at MDT-WIT0003057 (Letter of Concern) [Doc. No. 174-1] (capitalization omitted ).

      6.    Witkin Communicates His Concerns to the FDA and Raises Questions Regarding Physician Billing with Medtronic

In December 2010, Witkin filed a Complaint with the FDA and began corresponding with an FDA Investigator, Frank Lee. Def. Rel. Resp. SOF ¶ 76 [Doc. No. 202]. Witkin told Lee his concerns regarding Medtronic's practice of encouraging physicians to bill for iPro procedures performed by Medtronic personnel. Id.

At the end of December 2010, Witkin emailed Ware, asking whether a physician could bill insurance for iPro clinics performed exclusively by Medtronic personnel. Id. ¶ 74. Ware forwarded this email to Medtronic legal department. Id.

On January 5, 2011, Ware responded to Witkin's email inquiring about the circumstances under which a physician could properly bill for iPro services by forwarding a response from Medtronic's legal department. Id. ¶¶ 74, 77.

7. Witkin Is Placed on a Demanding Corrective Action Plan, and Witkin Communicates Further with the FDA

Two days later, on January 7, 2011, Ware placed Witkin on a 60-day Corrective Action Plan ("CAP"). Id. ¶¶ 38-40; see Doc. No. 174-8 (setting forth 60-day timeline).[9] The CAP imposed "virtually unattainable" sales requirements on Witkin. Id. ¶ 79. Witkin believed that the CAP was designed to "push him out of the company." Id. ¶ 80; see also id. ¶ 55 (citing Def. SOF, Ex. W (January 7, 2011 email to the FDA) [Doc. No. 174-23] ("I am getting fired for not conducting the [iPro] clinics. In my field ride review it says that I had never done one before. That is accurate because I never felt right about inserting needles into patients.")).

8. Witkin and Medtronic Attempt to Negotiate a Voluntary Separation Agreement and Witkin Identifies Himself to HR and Medtronic's Legal Department as a Whistleblower

On February 1, 2011, Witkin contacted Medtronic Human Resources to advise Medtronic that he wished to leave and to initiate negotiations regarding the terms of a voluntary separation agreement. Id. ¶ 49. Witkin claimed that he was being treated unfairly as "retaliation and discrimination [sic] based on knowledge gained from the senior commission overpayment [sic] issue" and believed he was being singled out as there were other managers in the district with worse performances. Id. ¶¶ 49, 81. On February 2, 2011, Ware emailed Witkin with a mid-point evaluation under the CAP, noting that Witkin had failed to meet his CAP goals or to keep pace with the rest of his district and nation. Rel. Resp. Def. SOF ¶ 50 [Doc. No. 186].

---

[9] Typically, at Medtronic, a CAP is the first step if someone is underperforming, followed by a performance improvement plan ("PIP"); if the employee has still failed to meet expectations at the end of the PIP, the employee may be terminated. Id. ¶ 45; see Def. SOF, Ex Y [Doc. No. 174-25]. Medtronic is an at-will employer however, and employees may be terminated for egregious behavior without a CAP. Def. SOF, Ex. Y at 6:20-7:7 [Doc. No. 174-25].

On February 5, 2011, Ortiz responded to Witkin's initial email, informing him she was willing to work on a separation agreement and connecting Witkin to Reuben Mjaanes, a member of Medtronic's in-house legal team. Id. ¶ 51.

On February 9, 2011, Witkin sent an email to Mjaanes with various attachments. Def. SOF, Ex. H [Doc. No. 174-8]. In one, a memorandum dated February 8, 2011, addressed to Medtronic Human Resources and Legal Department, Witkin provided his overview of his dispute with Ware, stating that Ware had pressured him to perform iPro procedures personally and had asserted that Witkin should have agreements with offices to free up office staff, and that Witkin had told Ware during a field ride that this "sounded like a kickback to me." Def. SOF, Ex. H at MDT-WIT0078761 [Doc. No. 174-8]. Witkin also referred to himself as a "whistleblower." Rel. Resp. Def. SOF ¶ 54 [Doc. No. 186]. Witkin made no mention of his complaints to the FDA. Id. ¶ 56.[10]

9.  Witkin Asks a Doctor for a Favor

Meanwhile, on October 14, 2010, Witkin emailed a physician, Dr. Krishnamurthy, asking for a "huge favor," namely filling open spots during the iPro clinic with patients because Ware would be at the clinic. Id. ¶ 59; see also Def. SOF, Ex. F at 297:8-21 (Witkin Tr.) [Doc. No. 174-6]. Dr. Krishnamurthy responded that "this is not a personal favor – and I am quite happy to help." Def. SOF, Ex. EE (Email from Dr. Krishnamurthy, dated October 14, 2010) [Doc. No. 174-31].

---

[10] One day prior to this email, on February 8, 2011, an FDA investigator had visited Medtronic's Northridge, California headquarters. Def. Resp. Rel. SOF ¶ 76 [Doc. No. 202]. Witkin states that he "came to understand" that the visit was to "investigate his complaint" but has no admissible evidence to support that statement. Even assuming it to be true, Witkin has not offered any evidence from which a jury may infer that Medtronic was aware that Witkin had initiated the complaint that led to the FDA visit.

In November 2010, Witkin again emailed Dr. Krishnamurthy, citing his concerns that he would be pushed out of Medtronic. Def. SOF, Ex. FF at WITKIN00029130 (Email from A. Witkin to Dr. Krishnamurthy, dated November 15, 2010) [Doc. No. 174-32]; see also Def. SOF, Ex. F at 298:18-299:2 (Witkin Tr.) [Doc. No. 174-6]. Witkin disclosed to Dr. Krishnamurthy that he was "not going to make it" to the numbers he was required to achieve. Def. SOF, Ex. FF at WITKIN00029130 [Doc. No. 174-32]. He asked Dr. Krishnamurthy if she thought she "could try to find 2 patients per day," noting "I can't believe I am asking you this" but adding "I know that you will only refer people who would benefit from pump therapy. If you do not see two folks that would benefit then please do not worry about it." Id.; see also Def. SOF, Ex. F at 303:9-25 (Witkin Tr.) [Doc. No. 174-6]. He explained that he had not "actually asked" any other physicians to help him in this direct way, but he had "told a few that I am under intense pressure." Def. SOF, Ex. FF at WITKIN00029130 [Doc. No. 174-32].[11]

At some point in February 2011, Witkin told his partner Christina Makinson that he had asked Dr. Krishnamurthy if she could "help him out by prescribing some pumps." Def. SOF, Ex. D at 84:4-21, 148:4-6 (Makinson Tr.) [Doc. No. 174-4]. In another conversation, Witkin told Makinson that he was also planning to ask another doctor to help them with their numbers by prescribing insulin pumps. Id. This felt "really unprofessional" to Makinson who, before leaving in late February/early March for her vacation, "ha[d] a conversation" with Rosemary Hintz in HR. Id. at 84:18-21.

10.  Witkin's Employment is Terminated

On February 28, 2011, Medtronic terminated Witkin's employment during a phone call between Witkin, Hintz, and Ware. Rel. Resp. Def. SOF ¶ 62 [Doc. No. 186]. On the call, Ware

---

[11] The email exchanges were sent from Plaintiff's personal email account, id., and there is no evidence in the record that Medtronic learned of them prior to discovery in this litigation.

9

said that the reason for the termination was that Witkin "ha[d] not met all the provision for the CAP to complete satisfaction, both performance and more importantly your behaviors," and later repeated himself by saying "Adam, as I mentioned earlier, we've made the—a business decision to employ—to terminate employment effective immediately just based on the kind of performance and more importantly your behaviors to this point through the CAP." Rel. Resp. Def. SOF, Ex. 12 at 2:13-15; 4:11-16 (Termination Phone Call Tr.) [Doc. No. 186-12].

    C.  *Discussion*

The FCA includes an anti-retaliation section, which provides in relevant part that "[a]ny employee . . . shall be entitled to all relief necessary to make [him] . . . whole, if that employee . . . is discharged . . . or in any other manner discriminated against . . . because of lawful acts done by the employee . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1). When analyzing an FCA retaliation claim on summary judgment where the defendant alleges an alternative explanation for the employee's termination, courts apply the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Lestage v. Coloplast Corp., 982 F.3d 37, 47 (1st Cir. 2020); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). To start, a plaintiff must establish a *prima facie* showing that "(i) he was engaged in conduct protected under the FCA; (ii) the employer had knowledge of this conduct; and (iii) the employer retaliated against the employee because of this conduct." Harrington, 668 F.3d at 31.

If the plaintiff meets this modest burden, the burden shifts to the employer to articulate a non-discriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802; Lestage, 982 F.3d at 47. Finally, if the employer also meets its burden of production by producing evidence of a legitimate motive, "the burden remains with the plaintiff to show

'that the proffered reason is a pretext calculated to mask retaliation.'" Lestage, 982 F.3d at 47 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991)).

The Oregon Whistleblower Statute likewise protects employees who "in good faith report[] information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." Or. Rev. Stat. § 659A.199(1). And both the Oregon Whistleblower Statute and the California common law analyze a *prima facie* claim of retaliation using a similar framework. See Neighorn v. Quest Health Care, 870 F. Supp. 2d 1069, 1102 (D. Or. 2012) (under Or. Rev. Stat. § 659A.199(1), "[i]f the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the inference of retaliation by offering a legitimate, non-discriminatory reason for the employee's termination"); Lawson v. PPG Architectural Finishes, Inc., 12 Cal. 5th 703, 718 (2022) (to rebut the presumption of discrimination, the employer need only provide "clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity").

1. Witkin's Prima Facie Retaliation Claim

"'[C]onduct protected under' the FCA retaliation provision encompasses an employee's 'investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government.'" Guilfoile v. Shields, 913 F.3d 178, 188 (1st Cir. 2019) (quoting United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 59 (1st Cir. 2017) (internal quotations omitted)). The First Circuit has concluded that "[t]his standard is consistent with the legislative intent that '[p]rotected activity [for purposes of an FCA retaliation claim] should . . . be interpreted broadly.'" Id. (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 236 (1st Cir. 2004), abrogated on other grounds by Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662 (2008)). "Put colloquially, rather than plausibly pleading the existence of a fire—the actual submission of a

false claim—a plaintiff alleging FCA retaliation need only plausibly plead a reasonable amount of smoke—conduct that could reasonably lead to an FCA action based on the submission of a false claim." Guilfoile, 913 F.3d at 189. The employer must have notice of the employee's protected conduct, but even the lodging of an internal complaint may be sufficient. U.S. ex rel. Gobble v. Forest Labs., Inc., 729 F. Supp. 2d 446, 450 (D. Mass. 2010) (finding complaint to supervisor regarding possible "kickbacks" to be protected conduct under the FCA).

To establish a prima facie case of retaliation under the Oregon Whistleblower Statute, a plaintiff must show that he "(1) engaged in a protected activity, (2) suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." Neighorn, 870 F. Supp. 2d at 1102. Like the FCA, the Oregon Whistleblower Statute "requires only that the employee reports in good faith information that the *employee believes* is a violation of state or federal law, thus, the employee 'need not be objectively correct about the existence of a statutory violation to sufficiently state a prima facie claim of retaliation.'" Id. (emphasis in original).

The California common law against wrongful discharge also protects an employee from retaliation against "warning [his or her employer that] it is violating fundamental public policies." Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 84 (1998). And again, the "employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity." Id. at 87.

    a.    The September and October 2010 Field Rides

Here, Witkin contends that he engaged in protected conduct under the FCA when he discussed the possibility of iPro-related kickbacks with Ware during the September 2010 field ride. See Rel. Resp. Def. SOF ¶ 54 [Doc. No. 186]. He asserts further that Ware had knowledge of this complaint, as it was made directly to him during their "field ride" in September 2010. Id.

¶¶ 27, 54. But Witkin has offered no admissible evidence as to the content of his September 2010 statements to Ware. Notably, his Affidavit is silent as to this conversation, and the evidence offered in support of the assertion is limited to his February letter (an out of court statement) describing the September 2010 events. See Rel. Resp. Def SOF, Ex. 23 (Witkin Aff.) [Doc. No. 186-23]. Similarly, Witkin states in his Affidavit that Ware directed him on the October 2010 Field ride to access patient medical records and that Witkin believed accessing patient medical records violated HIPAA, but again is silent as to what he actually said to Ware. See id. ¶ 4.[12]

Viewing the evidence in the light most favorable to Witkin, his refusal to perform as directed by his supervisor on the September or October 2010 field rides may well have been based on his concerns that Medtronic's activities amounted to a kickback or that he was being asked to perform the iPro clinic in a manner that would violate HIPAA or Oregon state law. But regardless, Witkin has offered no evidence that he expressed these specific concerns to Ware. And without coming forward with any evidence that Medtronic was on notice that he was concerned about potentially unlawful activity, he has failed to make a prima facie showing based on the September 2010 or October 2010 field rides.

    b. The Reports to the FDA and Oregon Medical Board

Witkin has provided evidence that he filed a complaint with the FDA in December 2010 and reported his concerns about iPro clinics to the FDA in a January 2011 letter, including that "[w]e do the clinics for the patient, the hook up and the download and they [the doctors] bill for

---

[12] Witkin contends that in the Letter of Concern Ware issued to him a few days later, Ware "characterized my refusal to violate HIPAA and clinic rules as an example of my making excuses and not having a 'can do' attitude." Id. That Letter of Concern, however, makes no mention of his refusal to violate HIPAA. Def. SOF, Ex. A at MDT-WIT0003057 (Letter of Concern) [Doc. No. 174-1].

it." Def. SOF, Ex. W [Doc. No. 174-23]. But there is no evidence in the record that Medtronic was aware of the complaints and correspondence at the time that they occurred.

        c.    Witkins' Inquiry about iPro Billing Structure and his Letter to Medtronic's Legal Department

Witkin has provided evidence that he asked his supervisor Mike Ware a question about Medtronic's iPro billing structure in an email in December 2010 that Ware forwarded to Medtronic's legal team. Def. SOF, Ex. H [Doc. No. 174-8]; Rel. Resp. Def. SOF ¶ 74 [Doc. No. 186]. Then, in February 2011, in a letter seeking to negotiate separation terms, Witkin brought his concerns about iPro clinics and sensor insertions directly to counsel for Medtronic, going so far as to identify the activities as possible "kickbacks" and calling himself a whistleblower. Shortly after he asked about the billing, he was placed on a corrective action plan, and shortly after the February 2011 letter, he was terminated.

These actions constitute sufficient evidence for a reasonable jury to conclude that while Medtronic was dissatisfied with Witkin's performance and attitude in the fall of 2010, it did not terminate his employment until after his December inquiry about billing and/or his February letter alerting Medtronic's counsel to his concerns about "kickbacks" and his claim that he was a whistleblower. Rel. Opp. FCA/AKS 14 [Doc. No. 185]. See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) ("[T]emporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'") (quoting Mariani–Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007)). As a result, Witkin has stated a prima facie case of retaliation and the burden of production shifts to Medtronic to come forward with an alternative reason for firing Witkin.

2. Medtronic's Alternative Reasons for Firing

Medtronic has provided various non-discriminatory reasons for terminating Witkin's employment. See McDonnell Douglas, 411 U.S. at 802. Medtronic points to internal conflicts with Witkin surrounding the commission repayment dispute. Def. Mem. ISO Retal. 11 [Doc. No. 173]. Medtronic also points to Witkin's poor performance reviews during the fall of 2010 and notes that Witkin was placed on a CAP. Rel. Resp. Def. SOF ¶¶ 38-39 [Doc. No. 186]. Medtronic notes further that Witkin inappropriately solicited patient referrals from doctors for his own personal gain, a practice Medtronic refers to in its briefing as "tin cupping" and characterizes as "egregious." These alternative reasons for firing Witkin are sufficient to meet Medtronic's burden of production.

3. Witkin's Burden to Show that a Reasonable Jury Could Find that Medtronic's Justifications Were Pretextual

Although the record presents a very close call, a reasonable jury could infer that Medtronic terminated Witkin when it did because of his protected activity rather than for these alternative reasons.

While Hintz and Ortiz have both claimed during the litigation that Witkin's "anger" over the commission dispute (which occurred prior to Witkin's claimed protected activity) was "disturbing," see id. ¶¶ 22, 23; Def. SOF, Ex. L at 89:15-90:4 (Hintz Tr.) [Doc. No. 174-12]; Def. SOF, Ex. P ¶¶ 13-14 (Ortiz Aff.) [Doc. No. 174-16] (Hintz and Ortiz describing Witkin as "disturbing" and "very angry" in conversations with them), there is no evidence in the record that Medtronic considered Witkin's behavior during these exchanges as grounds for counseling or discipline, let alone termination, prior to this litigation. Notably, the record contains no contemporaneous reports of these conversations, and there is no mention of them in any counseling documents, performance reviews, the CAP, or the termination interview.

Accordingly, a jury could find that the communications during the commission overpayment dispute played no part in Witkin's termination.

There is substantial evidence that Medtronic was dissatisfied with Witkin's performance and dismissive attitude in the fall of 2010, as set forth in the Field Coaching Reports, and that this dissatisfaction predated Witkin's protected activity. Indeed, prior to engaging in protected activity, Witkin repeatedly told others that Medtronic was trying to fire him. To the extent that Witkin's claim is that Medtronic set unattainable standards or placed him on a CAP to retaliate against him for engaging in protected activity, no reasonable jury could so find. But Witkin has also provided some evidence that Medtronic's normal practice would have been to place an employee on a performance improvement plan if needed after the CAP was completed, and that, after he sent his February email to Medtronic's counsel, he was terminated prior to being placed on a performance improvement plan. Def. Resp. Rel. SOF ¶ 87 [Doc. No. 202].

Finally, while Medtronic now describes his "tin cupping" as egregious, there is little in the record, one way or the other, to suggest that Medtronic viewed "tin cupping" in general as a dischargeable offense. Suggesting that a physician prescribe an unnecessary device as a personal favor is clearly unethical, but it is not clear how Medtronic would view a request that merely asks a doctor to prescribe Medtronic's device rather than a comparable device manufactured by another company.[13] Medtronic has offered no policies or guidance as to the lines that it draws regarding patient solicitation, or even how the practice of "tin cupping" is defined.[14] There is

---

[13] See Def. SOF, Ex. FF at WITKIN00029130 [Doc. No. 174-32] (Witkin's email to Dr. Krishnamurthy stating "I know that you will only refer people who would benefit from pump therapy.")

[14] Witkin focuses on the allegedly disparate treatment of a different TM, Kendall Cook, who was referred to in an email after he resigned as a "tin-cupper." Rel. Resp. Def. SOF, Ex. 10 [Doc. No. 186-10]. Witkin contends that two of Cook's largest accounts removed Cook's access to patients after he "started putting patients in the system" prior to approval and that Medtronic took no

also little evidence as to when Hintz became aware of Witkin's solicitation of patient referrals[15] and no evidence as to whether she shared these concerns with Ware or whether these concerns factored into the termination decision. Medtronic has produced no internal emails, phone calls, or other documentation showing with more specificity when the company was alerted to Witkin's tin-cupping or that the solicitation was considered in the termination decision. Rel. Resp. Def. SOF ¶ 57 [Doc. No. 186]. Again, during the phone call between Ware, Hintz, and Witkin, neither Ware nor Hintz mentioned tin-cupping, solicitation, Dr. Krishnamurthy, or "egregious conduct" at any point. Instead, Ware focused almost exclusively on Witkin's CAP performance as the justification for his firing but did not offer any explanation why Witkin would not be placed on a performance improvement plan rather than be fired. Taken in the light most favorable to Witkin, a reasonable jury could find that Medtronic manufactured a pretextual justification for firing Witkin in February 2011, rather than placing him on a performance improvement plan, because of his FCA complaint earlier that month.

## II.    Conclusion

For the foregoing reasons, Medtronic's Motion for Summary Judgment as to Witkin's Retaliation Claims [Doc. No. 172] is DENIED.

IT IS SO ORDERED

April 10, 2024                                    /s/    Indira Talwani
                                                  United States District Judge

---

action against him. See id. But although the term "tin-cupper" shows up in that email, there are insufficient details to allow the court to make a reasonable comparison between Cook's actions and Witkin's. Id.

[15] The only information about this conversation is from the deposition transcript of Witkin's co-worker Christina Makinson. But Makinson could not specify an exact date on which she alerted Rosemary Hintz to Witkin's behavior and could only speculate that she did so sometime before Makinson went on vacation in late February or early March. Hintz in turn has made no claim as to whether the solicitation played a part in the decision to terminate Witkin.

17